Present:  Carrico, C.J., Compton,[*] Lacy, Hassell, Keenan,
Koontz, and Kinser, JJ.

A. WILLIAM REID AND
RISING TIDE PRODUCTIONS, INC.

v.  Record No. 990769

JOHN J. BOYLE, ET AL.
                         OPINION BY JUSTICE LEROY R. HASSELL, SR.
                                March 3, 2000
JOHN J. BOYLE, ET AL.

v.  Record No. 990780

A. WILLIAM REID


        FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                   H. Thomas Padrick, Jr., Judge

                                I.

     In these appeals of judgments entered by the chancellor,

we consider, among other things:  whether the plaintiff

established by clear and convincing evidence that he owned an

interest in a leasehold; whether the plaintiff proved with

reasonable certainty damages he incurred as a result of the

defendants' breach of contract; and whether the plaintiff

proved a cause of action under the Virginia Antitrust Act.

                          II.  PROCEEDINGS

     Angas William Reid filed an amended bill of complaint

against John J. Boyle, Cellar Door Venues, Inc. (Cellar Door

---

        [*] Justice Compton participated in the hearing and decision
of this case prior to the effective date of his retirement on
February 2, 2000.

Venues), and Cellar Door Productions of Virginia, Inc. (Cellar Door Productions).  Reid asserted that he owned one-third of Cellar Door Venues' leasehold interest in an "[a]mphitheater project" in Virginia Beach.  He pled causes of action for breach of contract, "unjust enrichment," and fraud.  Reid also filed a motion for judgment against Cellar Door Productions.  Reid alleged that Cellar Door Productions breached its employment contract with him.

Rising Tide Productions, Inc., a Virginia corporation founded by Reid, and Reid filed a separate bill of complaint against Boyle, Kenneth A. MacDonald, Mike Tabor, The Boathouse Food Service Company, Cellar Door Productions, and Cellar Door Venues.  Reid and Rising Tide Productions alleged in this proceeding that these defendants violated the Virginia Antitrust Act, Code § 59.1-9.1, et seq.  The chancellor transferred the law action to the equity side of the court and consolidated the proceedings.

At the conclusion of an ore tenus hearing, the chancellor held that Cellar Door Productions breached its contract with Reid and that it was indebted to Reid in the amount of $333,325.67.  The chancellor held that Reid owned a one-third interest in the net value of Cellar Door Venues' leasehold interest and that Reid's interest had a value of $3,566,343. The chancellor entered a judgment in favor of Reid for that

2

amount against John J. Boyle and Cellar Door Venues, jointly and severally. The chancellor held that Reid and Rising Tide Productions failed to prove that the defendants in the antitrust proceeding had violated the Virginia Antitrust Act, and he entered a judgment in favor of those defendants. The defendants appeal the judgments adverse to them, and Reid and Rising Tide Productions appeal the judgment entered in the antitrust case.

### III.  FACTS

#### A.

When the chancellor hears evidence ore tenus, his decree is entitled to the same weight as a jury verdict, and we are bound by the chancellor's findings of fact unless they are plainly wrong or without evidence to support them. Prospect Development Co. v. Bershader, 258 Va. 75, 80, 515 S.E.2d 291, 294 (1999); Rash v. Hilb, Rogal & Hamilton Co., 251 Va. 281, 283, 464 S.E.2d 791, 793 (1996). Also, we will review the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to Reid in the two appeals of judgments in favor of Reid. Bershader, 258 Va. at 80, 515 S.E.2d at 294.

#### B.

Reid began to work for Cellar Door Productions in 1981 as a "talent middle agent." He made arrangements for bands to

perform at colleges, and he received a commission for his services. In 1982, Reid was promoted to the position of president of Cellar Door Productions. In that capacity, he continued to "[sell] talent" to colleges, and he "book[ed]" music concerts at facilities such as the Hampton Coliseum and the Norfolk Scope, as well as clubs. He also managed Cellar Door Productions' office.

Cellar Door Productions, acting through its sole shareholder, John J. Boyle, entered into an oral employment contract with Reid in 1983. Boyle is the majority shareholder of numerous entertainment-related companies that form a "family of companies" described as the Cellar Door Companies. These corporations include Cellar Door Productions and Cellar Door Venues. Boyle exercised virtually absolute control of these corporations and directed their offices and employees. Boyle conducted the financial affairs of these corporations with "an air of informality."

Pursuant to the terms of the oral contract, Reid's compensation was calculated by determining Cellar Door Productions' annual revenue, deducting expenses and any advancements of income to Reid or Boyle, and "split[ting]" the profit "50/50" between Reid and Boyle.

In December 1992, Reid signed a written employment contract with Cellar Door Productions. In 1993, Reid signed a

4

subsequent written employment contract with Cellar Door Productions. Even though the 1993 contract contained a specific methodology by which Reid would be compensated, Reid and Cellar Door Productions ignored the prescribed method of compensation. Reid testified that "[n]othing changed" regarding his method of compensation. In response to the question: "[How] [w]ere you paid under [the] contract?", Reid stated:

> "You know what, I don't know if I was paid under a contract. I know how I was paid. . . . A.J. Wasson [Boyle's chief financial officer] would come in at the end of the year. We would take all the available cash that was in the account. All the expenses were taken out mutually between Jack Boyle and myself, and we split the difference. And we split what was there. So that was — it's not exactly how it was calculated in the contract. If you read that contract, it says all kinds of tax stuff and deferred this and deferred that. . . . I don't think anyone could explain the computation as it exists in that contract.
> "We split the profit 50/50, and we did it from '83 or '84, and it was done that way every year as it relates to Cellar Door Productions."

Wasson initially testified that when determining Reid's compensation, Wasson adhered to the terms of the written contract. However, during cross-examination, Wasson admitted that he had not taken into consideration the various tax adjustments contained in the written contract. Finally, in response to the court's question, "[y]ou all had a very informal arrangement where they figured out available cash and

5

they split it," Wasson responded, "That's right, except for the tax adjustment." David H. Williams, the chief operating officer for all of the Cellar Door Companies, testified that Reid had a compensation agreement with Cellar Door Productions, and he received 50% of the profits generated by that corporation.

In the early 1990s, Reid conceived the idea of the creation of an amphitheater located in the City of Virginia Beach. The amphitheater would have a capacity of 20,000 seats. Reid believed that the amphitheater could attract major bands because it would be larger than existing concert facilities in Virginia. Reid testified: "Bands play where they can make the most money. It's called venue driven. The higher the capacity, the more tickets they can sell, the more money they can make, and hence, the more money a promoter [such as Cellar Door Productions] can make." Reid, who had "a little bit of experience working on" the development of the Classic Amphitheater in Richmond, approached Boyle and said: "[W]e need to have an amphitheater here." Boyle responded: "[A]s he said many times . . . Bill Reid, if you pull this off, you get half." Reid did not, however, memorialize this agreement in writing.

Reid undertook extensive efforts to develop an amphitheater in Virginia Beach. He had meetings with Virginia

Beach city officials, including City Council members. The City retained a consulting company to advise the City about the feasibility of construction of an amphitheater. During the ensuing three years, Reid served as president of Cellar Door Productions and also pursued the creation of an amphitheater in Virginia Beach. Boyle continued to encourage Reid to pursue the development of an amphitheater, and Boyle told Reid: "This is your future. This is your future. This is your kids' college education."

Subsequently, the City decided to participate in the construction of an amphitheater and to invest its financial resources in the project. The City of Virginia Beach Development Authority (also referred to as the City) ultimately executed an agreement with Cellar Door Venues, a Florida corporation which is primarily owned and exclusively controlled by Boyle. Pursuant to the terms of this agreement, Cellar Door Venues acquired a leasehold interest in the GTE Virginia Beach Amphitheater and served as operator of the amphitheater.

Initially, the City agreed to contribute $7,000,000 of the construction costs of the amphitheater, and Boyle, through companies that he controlled, agreed to contribute $5,000,000. After a site for the amphitheater was selected, the City learned that there were problems with the soil conditions and,

7

therefore, the cost of construction would be higher than had been anticipated. City officials scheduled a meeting that was attended by Reid, Boyle, and Richard Rosenbaum, who was described as "Boyle's personal attorney." During the meeting, the City officials informed Boyle that the City expected him to increase his contribution to the project to help pay for the increased cost of construction associated with the soil conditions.

After the meeting with the City officials, Boyle and Reid had a conversation in a car, and Rosenbaum was present. Reid described the conversation as follows: "I remember vividly, and I remember when it happened, we were [in the car] approaching the airport. And [Boyle] said, Bill, my contribution's going to have to go up from 5 to $7 million. Because of that, I'm going to have to cut you down on your percentage from 50 percent to 33 percent." Even though Reid was upset that Boyle had decided to decrease Reid's percentage of ownership in the project, Reid felt "that it was only fair that I take less . . . and [Boyle] take more." Reid did not request that Boyle document this agreement in writing because Reid and Boyle had been involved in "other deals" in which Reid had an ownership interest that was not memorialized with written documentation.

Cellar Door Productions contributed between $150,000 and $200,000 of its profits to fund the initial stages of the amphitheater project. Approximately half of this money belonged to Reid as a result of the "50/50" compensation arrangement that he had with Cellar Door Productions. When asked why he was not concerned that the money, half of which was his, was used to help finance the initial phases of the development of the amphitheater, Reid responded: "Because I figured I owned it. I owned a third. What difference did it make?"

The City required a letter of credit from Cellar Door Venues in the amount of $696,000 before the City would proceed with site preparation for the construction of the amphitheater. The purpose of the letter of credit was to reimburse the City for certain costs it incurred in the event that the project was abandoned because of the poor soil conditions. Reid, along with Boyle and his wife, Janet A. Boyle, signed the letter of credit as guarantors. Reid also signed a separate guaranty in the amount of $696,000. Reid testified that he signed the guaranty "[b]ecause it was clear in my mind and in Jack Boyle's mind that I was a one-third owner of the [a]mphitheater." Reid stated that he would not have signed the guaranty had he not had an ownership interest in the project. Reid testified that his house was used as

9

collateral for the letter of credit.  In response to requests for admission, Cellar Door Productions admitted that "Reid's signing as a personal guarantor went above and beyond his job description as President of Cellar Door Productions."

Reid and Boyle's relationship began to deteriorate in 1997.  Reid and Boyle met for lunch in Virginia Beach, and Reid complained about problems that he was experiencing that he thought were detrimental to their mutual business interests.  During that meeting, Reid reminded Boyle that Reid was "a one-third partner with him."  Boyle responded that he had a poor memory and requested that Reid "[write] down all of the points" that they had discussed and "fax him back the points that [they] had discussed."  During the meeting, Boyle did not deny that Reid owned an ownership interest in the amphitheater project.

Subsequently, Reid forwarded a memorandum to Boyle which described the subjects they discussed at the Virginia Beach luncheon.  Included among those subjects was Reid's assertion that he owned a one-third interest in the amphitheater project.  Even though Boyle subsequently discussed the other subjects that were contained in the memorandum with Reid, he did not discuss Reid's claim of ownership in the amphitheater project.

Thomas J. Lyons, Jr., Boyle's friend for over 35 years, testified on behalf of Reid. Lyons and his wife attended a concert in July 1996 at the newly constructed Virginia Beach Amphitheater as guests of Boyle and his wife. Lyons complimented Boyle for the excellent work and effort that Reid had undertaken in making the amphitheater a reality. According to Lyons, Boyle stated: "Well, that's why he's my partner. . . . that's why he owns 35 percent in this — in the Amphitheater or this project." After Lyons finished his testimony, the chancellor remarked on the record that Boyle stood up from his seat and "hugged" Lyons, even though Lyons had just provided testimony detrimental to Boyle.

Reid had a conversation with Boyle in October 1997, and he requested that Boyle provide Reid with a written agreement documenting Reid's interest in the amphitheater project. Later, Boyle had a telephone conversation with Reid, and Boyle informed Reid "I got the agreement. I wanted to give it to you, but it was too — the lawyers made it too complicated." Reid never saw the document. In November 1997, Reid received a letter from Boyle. Pursuant to the terms of the letter, Boyle essentially promised Reid that Boyle would give Reid 10% of the profit stream generated by the amphitheater and 10% of the proceeds from any sale of Cellar Door Venues. Reid

rejected the terms of the letter, which he described as a counteroffer.

Boyle testified that he told Lyons that Reid was his partner, but he denied telling Lyons that Reid owned an interest in the amphitheater project.  Boyle stated that he only promised Reid that Boyle would "split" certain profits from the amphitheater project with him.  Furthermore, Boyle testified that none of the presidents who worked for him in his various corporations owned any interests in any corporations with him.  However, Reid testified that he was an equity owner in a corporation known as Abyss and that Boyle was also an owner of the corporation.  Reid did not receive any written documentation of his ownership interest in Abyss until he was fired from his position of president of Cellar Door Productions in December 1997.  Reid was also a shareholder in another corporation with Boyle called BWRM.

Boyle often entered into business ventures with others without documenting the nature of the relationships in writing.  Boyle testified that his son, along with four other persons including Reid, are the owners of a corporation in Virginia Beach called Abyss.  Boyle gave the following testimony about the ownership of this corporation:

"Q:  Was there anything in writing setting forth what understandings there were about how the

        Abyss was going to get started and who was
        going to own what or do what?
"A: You'd have to check with them.
"Q: You don't recall?"
"A: No.
"Q: You don't worry about those details?"
"A: No, I don't."

Boyle also testified that he gave the ownership of a corporation called the Capital Ballroom to David Williams. When asked, "[d]id you put that in writing prior to it opening, that you were going to give [Williams] that ownership?", Boyle responded, "[n]o." Even though Boyle was in the process of selling most of the corporations within the Cellar Door Companies to another corporation, SFX, for $106,000,000, he testified that he did not have a definitive agreement in place at the time of trial.

At the conclusion of the trial, the chancellor made a specific finding that "Mr. Boyle just was not credible."

IV. THE OWNERSHIP CASE

A.

The defendants, Boyle, MacDonald, Tabor, The Boathouse Food Service Company, Cellar Door Productions, and Cellar Door Venues, argue that the chancellor erred in holding that Reid presented sufficient evidence to establish an enforceable contract. The defendants assert that Reid's purported contract was vague and lacked specificity. The defendants also contend that Reid failed to establish the parties to the

13

contract and the type of ownership interest that had been promised to Reid.  We disagree with these defendants.

We have stated the following contract principles which are equally pertinent here:

> "The law does not favor declaring contracts void for indefiniteness and uncertainty, and leans against a construction which has that tendency. While courts cannot make contracts for the parties, neither will they permit parties to be released from the obligations which they have assumed if this can be ascertained with reasonable certainty from language used, in the light of all the surrounding circumstances.  This is especially true where there has been partial performance.  McDaniel v. Daves, 139 Va. 178, 190, 123 S.E. 663, 666 [1924]; Phillips Petroleum Company v. Buster, 241 F.2d 178 [10th Cir. 1957], cert. denied, 355 U.S. 816 . . . .
> "We have repeatedly said that in construing a contract, '[r]egard should be had to the intention of the parties, and such intention should be given effect.  To arrive at this intention, regard is to be had to the situation of the parties, the subject matter of the agreement, the object which the parties intended to accomplish.  A construction should be avoided if it can be done consistently with the tenor of the agreement, which would be unreasonable or unequal, and that construction which is most obviously just is to be favored as most in accordance with the presumed intention of the parties.'  Seward v. American Hardware Co., 161 Va. 610, 625, 626, 171 S.E. 650, 659 [1933]; White v. Sayers, 101 Va. 821, 826, 45 S.E. 747, 749 [1903]."

High Knob, Inc. v. Allen, 205 Va. 503, 507-08, 138 S.E.2d 49, 53 (1964).  Accord W.J. Schafer Assoc. v. Cordant, Inc., 254 Va. 514, 519-20, 493 S.E.2d 512, 515 (1997); Allen v. Aetna Casualty & Surety, 222 Va. 361, 363-64, 281 S.E.2d 818, 819-20 (1981).

Applying these principles, we hold Reid presented evidence which would permit the chancellor to ascertain, with reasonable certainty, from the language that the parties used and in light of all the surrounding circumstances, that Reid entered into an oral contract with Boyle and Cellar Door Venues and that pursuant to the terms of this contract, Boyle and Cellar Door Venues promised to give Reid a one-third interest in the value of Cellar Door Venues' leasehold interest in the amphitheater. Reid presented evidence of the following pertinent facts. Boyle exerted absolute control of Cellar Door Venues which owned the leasehold interest, and Boyle conducted the corporation's financial affairs with an "air of informality." Boyle promised Reid that he would own one-third of the amphitheater project if Reid could bring his concept of an amphitheater in Virginia Beach to fruition. Boyle repeatedly assured Reid that Reid owned a one-third interest in the amphitheater project. As we have already stated, Boyle told Lyons, his friend for 35 years, that Reid owned an interest in the amphitheater project.

Reid also partially performed this oral contract. Reid permitted approximately $88,000 of compensation that he ultimately received from Cellar Door Productions to fund the initial operational costs for Cellar Door Venues. Significantly, Reid signed a letter of credit and a guaranty

15

which the City required before it would proceed with the construction of the amphitheater. Boyle and Cellar Door Venues admitted in their response to a request for admission that Reid's acts of signing the personal guaranty and letter of credit were "above and beyond" his job responsibilities as president of Cellar Door Productions.

The chancellor was also certainly entitled to consider, as a surrounding circumstance, Boyle's history of giving employees, including Reid, ownership interests in corporations that Boyle controlled. The chancellor also considered the fact that Cellar Door Venues' primary asset was its leasehold interest with the City, and Boyle's statement to Reid that Boyle had an agreement that would confer an ownership interest to Reid in the amphitheater project, but that "the lawyers [had] made it too complicated" and that Boyle intended to return it to the lawyers for simplification.

### B.

The defendants observe that Reid had a written contract with Cellar Door Productions which contained the following provision:

> "Entire Agreement. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and, upon its effectiveness, shall supersede all prior agreements, understandings and arrangements, both oral and written, between the Executive and the Company (or any of its affiliates) with respect to such subject

16

> matter. This Agreement may not be modified in any way unless by a written instrument signed by both the Company and the Executive."

The defendants contend that even though Reid asserts that the oral contract for ownership of an interest in the amphitheater was a "new deal" between Boyle and Reid which was unrelated to the above-referenced provision in the employment agreement, "the alleged oral contract addresses precisely the subject matter addressed by the [e]mployment [a]greement." Continuing, the defendants say that the amphitheater project was a business opportunity of the Cellar Door Companies pursued locally by Reid as president of Cellar Door Productions, that at the time of the alleged oral contract Cellar Door Venues "did not yet exist, and any 'new' deal between Boyle and Reid necessarily required alteration of Reid's [e]mployment [a]greement with [Cellar Door] Productions." Additionally, these defendants contend that the chancellor failed to articulate the burden of proof he applied in holding that Reid proved his oral contract claim. We disagree with defendants.

We have held that a contract in writing may be modified by a new oral contract. In Zurich General Accident & Liability Ins. Co. v. Baum, 159 Va. 404, 409, 165 S.E. 518, 519 (1932), we stated:

17

"A contract in writing, but not required to be so by the statute of frauds, may be dissolved or varied by a new oral contract, which may or may not adopt as part of its terms some or all of the provisions of the original written contract. . . . Nor does it make any difference that the original written contract provided that it should not be substantially varied except by writing. This stipulation itself may be rescinded by parol and any oral variation of the writing which may be agreed upon and which is supported by a sufficient consideration is by necessary implication a rescission to that extent."

Additionally, modification of a contract must be shown by "clear, unequivocal and convincing evidence, direct or implied." Stanley's Cafeteria, Inc. v. Abramson, 226 Va. 68, 73, 306 S.E.2d 870, 873 (1983).

We have also held that contracting parties, through a course of dealing, may evince a mutual intent to modify the terms of their contract. The circumstances surrounding the conduct of the parties must be sufficient to support a finding of mutual intention that the modification be effective and such intention must be shown by clear, unequivocal, and convincing evidence, direct or implied. Id.

We hold that Reid established with clear, unequivocal, and convincing evidence that he and the defendants orally modified the written contract, and that they also modified the contract by their course of dealing. The facts contained in Part III.A. of this opinion, which we need not repeat, clearly demonstrate that Reid established by clear, unequivocal, and

18

convincing evidence that Boyle, acting on behalf of himself and Cellar Door Venues, promised Reid that he would have a one-third interest in the amphitheater leasehold in return for Reid's efforts to bring the project to fruition.

Furthermore, the evidence summarized in Part III.A. of this opinion clearly indicates that Reid and Cellar Door Productions modified the written contract by their course of dealing. The parties simply ignored the terms of the written employment agreement. For example, Cellar Door Productions never followed the terms of the written employment contract when determining the amount of compensation owed to Reid. The written contract was misplaced and when the various lawsuits were filed, the litigants did not even know which written contract was the so-called operative contract.

In Mullins v. Mingo Lime & Lumber Co., 176 Va. 44, 50, 10 S.E.2d 492, 494 (1940), we stated that "an agreement for service must be certain and definite as to the nature and extent of service to be performed, the place where and the person to whom it is to be rendered, and the compensation to be paid, or it will not be enforced." Here, the terms of the oral contract are certain and definite. Reid was required to perform the necessary services to make the amphitheater a reality, and the services were to be performed for Boyle and the corporations that he controlled in the Cellar Door

19

Companies.  The compensation that Reid was to receive was a one-third interest in the value of the amphitheater project, in this instance, the value of the leasehold that Cellar Door Venues acquired with the City.

C.

The defendants argue, "[h]ow was Reid to receive [an] 'ownership interest' and what was it?  [Cellar Door] Venues is a stock corporation, yet . . . Boyle and Reid never discussed 'stock' or 'equity.'  There is no evidence of an agreement by Boyle to convey 33% of Venues' shares to Reid, even though that was the only [a]mphitheater-related entity in which Boyle could have transferred ownership."  The defendants also contend that the circuit court "effectively treated Reid as if he were a shareholder of Venues who had a right to put his shares to the corporation upon his termination, at a price measured by the going concern value of the corporation."

We find no merit in the defendants' contentions.  The chancellor did not award Reid shares of stock in Cellar Door Venues; nor did the chancellor treat "Reid as if he were a shareholder of [Cellar Door] Venues."  Additionally, the chancellor did not award Reid one-third of the value of Cellar Door Venues.  Rather, the chancellor merely enforced the terms of the contract that Boyle made with Reid.  The chancellor made a finding of fact that Boyle gave Reid a one-third

20

interest in the leasehold, and the chancellor determined the value of Reid's leasehold interest. We also observe that the defendants do not assert that Boyle lacked the legal authority to convey a corporate asset, in this instance a portion of the leasehold interest, to Reid.

### D.

The chancellor, in his judgment order, dismissed Reid's claim of unjust enrichment as moot because the chancellor held that Reid established that he had an oral contract for a one-third interest in the amphitheater lease with Boyle and Cellar Door Venues. However, the chancellor at Reid's request held in the alternative that the evidence was sufficient to support a claim for unjust enrichment. The defendants assert that the chancellor erroneously applied principles of equity. We need not consider the court's alternative holding because Reid prevailed on his breach of an oral contract claim. See Royer v. Board of County Supervisors, 176 Va. 268, 279-80, 10 S.E.2d 876, 881 (1940); accord Nedrich v. Jones, 245 Va. 465, 477, 429 S.E.2d 201, 207 (1993).

### E.

The defendants contend that the chancellor "adopted a measure of damages . . . unsupported by the facts or by the testimony of the expert witnesses." Reid's business valuation expert testified that Cellar Door Venues had a value of

$20,289,791, and the defendants' expert witnesses testified that Cellar Door Venues had a value of $10,567,000. Each of the expert witnesses described the methodologies he used to support his valuation. The defendants contend that the chancellor's holding that the value of Cellar Door Venues' leasehold interest in the amphitheater was $16,000,000 constitutes a compromise and is the "functional equivalent of a compromise jury verdict." Reid asserts that the defendants may not raise this issue on appeal because they failed to make any objection in the circuit court to the methodology that the chancellor used in placing a value on the leasehold interest. Responding in their reply brief, the defendants state that the chancellor's purported error "is not an error that could have been addressed as an evidentiary objection, as it is a defect in the reasoning process by which the court . . . reached its result."

We agree with Reid. Rule 5:25 states in relevant part:

"Error will not be sustained to any ruling of the trial court . . . unless the objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."

The chancellor's determination that the leasehold interest had a value of $16,000,000 is a ruling within the intendment of Rule 5:25. The application of Rule 5:25 is not limited to evidentiary rulings. Rather, Rule 5:25 "exists to protect the

22

trial court from appeals based upon undisclosed grounds, to prevent the setting of traps on appeal, to enable the trial judge to rule intelligently, and to avoid unnecessary reversals and mistrials."  Fisher v. Commonwealth, 236 Va. 403, 414, 374 S.E.2d 46, 52 (1988), cert. denied, 490 U.S. 1028 (1989).

### F.

Gregory F. Lawson, who qualified as an expert witness on the subject of business valuation, testified on behalf of Reid that the value of Cellar Door Venues' leasehold interest in the amphitheater was $20,045,000.  The defendants argue that the chancellor erred by admitting Lawson's testimony because they claim his testimony was speculative and lacked a "proper evidentiary foundation."  We disagree.  We have reviewed Lawson's testimony in its entirety, and we hold that the chancellor did not abuse its discretion by admitting in evidence the challenged testimony.

### V.  THE COMPENSATION CASE

As we have already stated, Reid claimed that Cellar Door Productions breached its contract by failing to pay him compensation that he was entitled to receive for the 1997 calendar year.  Reid testified that he was entitled to receive 50% of all profits realized in each calendar year by Cellar Door Productions.

Willie J. Rountree, a certified public accountant who qualified as an expert witness, reviewed certain financial documents that had been produced by the defendants and information that Reid had provided to him. Rountree described the compensation methodology as follows. Cellar Door Productions "took the cash at the end of the year [and made] certain adjustments. For instance, if there [were] additional receivables outstanding for cash that had not been received for [concerts] that had already been completed, they would add those as additions to cash. If [there] were accounts payable outstanding for bills that had not been paid at the end of the year, they would show those as subtractions from cash available for the split, and they would also add back any advances that [Reid or Boyle] had received during the year to come up with a balance they called available cash. And that would be split between the two of them."

Rountree stated, during the defendants' cross-examination, that information that he relied upon in making his calculations had been provided to him by Reid. The defendants asked Rountree to assume that Reid had already received certain payments as compensation which Rountree had not used in his calculations. The defendants further asked Rountree whether this assumption would affect the amount of compensation he believed Reid was entitled to receive from

Cellar Door Productions.  Rountree replied yes.  In response to the chancellor's question, whether, in Rountree's opinion, Cellar Door Productions owed Reid $334,665.21, Rountree replied in the affirmative.  Rountree also stated in response to that same question that even though the defendants' counsel raised interesting issues about Rountree's assumptions, Rountree had not seen sufficient documentation to opine whether the defendants' assumptions were correct.

The defendants contend that the chancellor erred by relying upon Rountree's testimony because Rountree did not know whether the defendants' assumptions were correct.  Additionally, the defendants contend that Rountree relied upon certain information that had been provided by Reid that Wasson, chief financial officer and director of business development for the Cellar Door Companies, disputed.

We find no merit in the defendants' contentions.  We have reviewed Rountree's testimony in its entirety, along with his exhibits that include his calculations.  Rountree testified that his opinions and calculations were based upon the defendants' audited financial statements, financial documents produced during discovery, and information provided by Reid.  We hold that this information is sufficient to support Rountree's opinions.

## VI.  THE ANTITRUST CASE

After Reid was terminated as president of Cellar Door Productions, he founded Rising Tide Productions, Inc., a Virginia corporation which is "a promoter of live music entertainment." Reid serves as president of Rising Tide Productions.

Reid and Rising Tide Productions contend that defendants Boyle, MacDonald, Tabor, The Boathouse Food Service Company, Cellar Door Productions, and Cellar Door Venues prevented Reid and Rising Tide Productions from booking concerts at "two publicly owned, unique, essential concert venues, the GTE Virginia Beach Amphitheater and The Boathouse." The Boathouse "is a concert facility with a capacity of approximately 2,460." The City of Norfolk owns The Boathouse, which is leased by The Boathouse Food Service Company, a corporation which is "a part of the Cellar Door family of companies." MacDonald is president and general manager of Cellar Door Productions. Tabor is the general manager of the Virginia Beach Amphitheater.

Reid and Rising Tide Productions presented evidence that their attorneys forwarded a letter to the defendants' attorneys and inquired how Reid and Rising Tide Productions might rent the Virginia Beach Amphitheater and The Boathouse. Reid testified that when he attempted to rent the amphitheater, he was denied permission to do so.

Additionally, William B. Wells, a promoter, testified that an employee of the Cellar Door Companies tried to discourage Wells from transacting business with Reid and Rising Tide Productions. The Cellar Door Companies employee warned Wells that he should not transact business with Reid.

Michael Mitnick, a certified public accountant, testified that the ability to rent The Boathouse and the amphitheater is essential to a Virginia Beach concert promoter such as Reid. He opined that concert bands that perform in large outdoor amphitheaters are required to transact business with the defendants because they control all the large amphitheaters in Virginia and North Carolina.

Reid and Rising Tide Productions sought injunctive relief against the defendants for their purported violations of the Virginia Antitrust Act. The chancellor dismissed Reid's antitrust claims and entered a judgment on behalf of the defendants. Reid asserts, among other things, that the chancellor erred in failing to grant the requested injunctive relief. Responding, the defendants assert that Reid and Rising Tide Productions failed to prove that the defendants violated the Virginia Antitrust Act. We agree with the defendants.

Code § 59.1-9.2 of the Virginia Antitrust Act states:

"The purpose of this chapter is to promote the free market system in the economy of this Commonwealth by prohibiting restraints of trade and monopolistic practices that act or tend to act to decrease competition. This chapter shall be construed in accordance with the legislative purpose to implement fully the Commonwealth's police power to regulate commerce."

Code § 59.1-9.5 states: "Every contract, combination or conspiracy in restraint of trade or commerce of this Commonwealth is unlawful." Code § 59.1-9.6 states: "Every conspiracy, combination, or attempt to monopolize, or monopolization of, trade or commerce of this Commonwealth is unlawful." Code § 59.1-9.12(a) states:

"Any person threatened with injury or damage to his business or property by reason of a violation of this chapter may institute an action or proceeding for injunctive relief when and under the same conditions and principles as injunctive relief is granted in other cases."

The record is simply devoid of sufficient facts that would have permitted the chancellor to conclude that the defendants violated any of the aforementioned statutes. Reid and Rising Tide Productions failed to prove the existence of any contract or conspiracy in restraint of trade or commerce. Additionally, Reid and Rising Tide Productions failed to establish the existence of a conspiracy, combination, or attempt by the defendants to monopolize trade or commerce in this Commonwealth.

VII.

28

For the reasons stated, we will affirm the judgments entered by the chancellor.

Record No. 990769 — <u>Affirmed</u>.
Record No. 990780 — <u>Affirmed</u>.