**In re ANTAEUS TECHNICAL SERVICES, INC., Debtor.**

No. 99–02114.

United States Bankruptcy Court, W.D. Virginia, Roanoke Division.

Dec. 6, 2005.

Howard J. Beck, Jr., Gentry Locke Rakes & Moore, Roanoke, VA, for Debtor.

### *MEMORANDUM DECISION*

WILLIAM F. STONE, JR., Bankruptcy Judge.

The matter before the court is the Trustee's Motion to Establish Bidding Procedures for the Sale of Certain Patents and Other Assets of the Debtor.

### FINDINGS OF FACT

1. On June 21, 1999, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was commenced against the Debtor, Antaeus Technical Services, Inc. ("Antaeus") The case was converted to a Chapter 11 case on November 24, 1999. On February 17, 2000, an order re-converting the case to Chapter 7 was entered by this Court. Robert T. Copeland was duly elected, qualified and appointed Trustee for the Debtor.

2. On June 5, 2000, VBS Investment Pty. Limited ("VBS") filed a proof of claim alleging a secured claim in the amount of $8,334,800.04 plus interest, fees and costs.

3. The Trustee filed a Complaint against VBS, thereby commencing Adversary Proceeding 02–0029A, seeking to avoid preferential transfers of property and to subordinate security interests and claims on March 7, 2002.

4. On October 15, 2002, the Trustee filed an Objection to VBS's claim.

5. For purposes of discovery, the Objection to VBS's claim and Adversary Proceeding 02–0029A were consolidated by a January 15, 2003 order.

6. On June 10, 2004, the Trustee filed a Motion to approve a Settlement Agreement resolving all issues between the Trustee and VBS.

7. An order approving the Settlement Agreement was entered by the Court on July 19, 2004 [1]. A true and correct copy of the Settlement Agreement is attached hereto as Exhibit A [2] and is incorporated by reference. The Settlement Agreement provided that if the Trustee sold the Debtor's assets prior to December 31, 2004, VBS would receive the first $1,000,000 of the net sale proceeds less the Trustee's fees and expenses which were not to exceed $100,000.[3] Additionally, VBS was entitled to a credit bid up to $1,500,000 at any sale of the assets prior to December 31, 2004. If the Trustee did not sell the Debtor's assets before December 31, 2004, the Settlement Agreement provided VBS with two options—pay the Trustee $50,000 for the assets before January 15, 2005 or be deemed to have released its lien on the assets and abandoned any claim in the Debtor's estate.[4] Furthermore, the Settlement Agree-

---

1. Pursuant to a separate order of the same date, Adversary Proceeding 02–0029A and the Objection to VBS's claim was dismissed with prejudice.

2. At the November 18, 2005 evidentiary hearing, counsel for VBS conceded that the Settlement Agreement is not ambiguous and that there was no misunderstanding among the parties at the time of execution as to what they were entering.

3. Net sale proceeds in excess of $1,000,000 were to be paid in $150,000 increments alternating between the Trustee and VBS.

4. VBS was to formally withdraw its claim and file all documents required to release its claim in any of the Debtor's property by February 15, 2005.

ment provided it could be amended only by a writing signed by the parties and was to be governed and construed in accordance with the laws of the Commonwealth of Virginia.

8. The Trustee suffered a heart attack on December 14, 2004 and returned to work on a limited basis on January 17, 2005.

9. The Trustee did not sell the assets before December 31, 2004 as provided for in the Settlement Agreement. VBS did not pay the Trustee $50,000 in exchange for the assets by January 15, 2005 nor did VBS formally withdraw its claim by February 15, 2005.

10. On January 13, 2005, Joel Walker, counsel for VBS, contacted Mark Esposito, counsel for the Trustee, by telephone requesting an extension of the January 15, 2005 deadline set forth in the Security Agreement. Mr. Esposito informed Mr. Walker that he did not have the authority to extend the deadline but that he believed the Trustee would be agreeable to extending the deadline to Monday, January 17, 2005.[5]

11. On Tuesday, January 18, 2005, Mr. Walker emailed Mr. Esposito stating that he had not spoken to the Trustee and asking if he should contact the Trustee directly.

12. On Thursday, January 20, 2005, Mr. Walker emailed Mr. Copeland asking the Trustee to contact him.

13. On January 26, 2005, Mr. Walker spoke to the Trustee by telephone.

The Trustee agreed to continue his sale efforts and to provide VBS with a summary of his sale efforts.[6] The parties did not discuss specific provisions of the Settlement Agreement and no specific deadline was discussed. Mr. Walker testified that the parties "agreed to continue as they had been." The Trustee testified that, in his mind, the parties were continuing the status quo.

14. The Trustee filed an Objection to VBS's claim on April 1, 2005 arguing that VBS's claim should be amended to reflect the Settlement Agreement. On April 26, 2005, VBS asked the Trustee to withdraw the Objection to VBS's claim without prejudice. The Trustee responded that the Objection could be resolved by VBS filing an amended proof of claim reflecting the terms of the Settlement Agreement. On April 27, 2005, VBS replied and explained to the Trustee that it would be forced to file a response to the Objection stating that the Trustee did not use his best efforts to comply with the terms of the Settlement Agreement. On May 2, 2005, the Trustee agreed to prepare an order dismissing the Objection to VBS's claim without prejudice to file a new objection at a later date and on July 12, 2005 such an order was entered by the Court.

15. On May 3, 2005, VBS offered to purchase the assets for $20,000. The Trustee responded that he had

---

5. At the evidentiary hearing in this matter, Mr. Walker testified in response to a question from the Court that VBS had not deposited the $50,000 purchase price stipulated in the Settlement Agreement in his firm's trust account or was otherwise prepared to exercise such right of purchase.

6. The Trustee provided VBS with a summary of his sale efforts on or about April 27, 2005.

received a bid from Fred M. Leonard for $25,000.[7]

16. VBS proposed to pay the Trustee $25,000 for the assets in an email dated May 19, 2005. In his email, Mr. Walker acknowledged that the Settlement Agreement would need to be modified and presented to the Court for approval. Mr. Walker testified that court approval would be necessary for such a change since $50,000 as provided in the Settlement Agreement had been noticed to creditors. The Trustee did not directly respond to VBS's offer. Instead, the Trustee advised VBS that he was going to consult his 702 Committee, which subsequently approved VBS's offer.

17. Sometime in August 2005, JAR Acquisition, LLC ("JAR") contacted the Trustee regarding the purchase of the assets and serving as a stalking-horse bidder in a potential sale of the assets. JAR subsequently conducted due diligence that included reviewing actual and potential liens, claims and encumbrances on the assets, negotiating and drafting the Letter Agreement entered into with the Trustee, and noticing the Trustee's Motion to approximately 1,100 parties.

18. On September 8, 2005, the Trustee informed VBS of JAR's interest in the assets and that JAR was coming to the Trustee's office in Abingdon to begin working on due diligence.

19. During JAR's due diligence review, the Trustee informed JAR of the Settlement Agreement between the Trustee and VBS. The Trustee described the Settlement Agreement as providing a sale proceeds distribution scheme. JAR requested a copy of the Settlement Agreement from the Trustee. Mr. Copeland testified that he told Mr. Shuster, one of JAR's attorneys, about the Settlement Agreement and that it was in full effect. He testified that he had no discussion of a right to credit bid with any purchaser. The Trustee further stated that he did not remember the credit bid provision of the Security Agreement; he recalled simply that it provided the first $100,000 of any sale proceeds would go to the bankruptcy estate and the next $900,000 to VBS.

20. VBS offered to pay $50,000 pursuant to the Settlement Agreement on September 21, 2005. The Trustee did not directly respond to VBS's offer. Instead, the Trustee informed VBS that JAR had asked for a copy of the Settlement Agreement. The Trustee explained that he could not locate the Settlement Agreement in his file and asked VBS to provide him with a copy.

21. On September 27, 2005, JAR entered into a quite detailed Letter Agreement with the Trustee for the purchase of the assets for $52,000.00. A true and correct copy of the Letter Agreement is attached hereto as Exhibit B and is incorporated by reference.

22. On October 5, 2005, the Trustee supplied Mr. Walker with a copy of the Letter Agreement he entered with JAR stating "[i]n preparing it neither of us had the settlement agreement. [Mr. Esposito's] file was in storage and I didn't have

---

7. When the Trustee received Mr. Leonard's written offer on May 6, 2005, it was only for $20,000. By email, the Trustee informed VBS of the change in Mr. Leonard's offer.

one from you, so in their due diligence lien search they kept telling me they could not find a lien and I told him we had found one and settled the issue, but since neither of us had the agreement, we used the language that we did." (JAR Exhibit E).

23. On October 6, 2005, the Trustee provided JAR with a copy of the Settlement Agreement. The Settlement Agreement has been on file with the Court since approximately June 10, 2004 [8] and was available upon request to the Trustee, VBS, or JAR. Counsel for JAR conceded at the November 18, 2005 evidentiary hearing that his firm failed to ask the Court for a copy of the Settlement Agreement despite JAR's request for approximately thirty other documents filed in this case.

24. On October 4, 2005, the Trustee filed a Motion to approve the sale of certain patents and other assets of the Debtor to JAR subject to higher and better offers and to establish bidding procedures for the sale. A Motion to Expedite the hearing, which was scheduled for October 19, 2005, was also filed.

25. On October 18, 2005, the day preceding the noticed hearing, VBS filed a response to the Trustee's Motion alleging that the Motion failed to include VBS's right to credit bid which is provided for in the Settlement Agreement approved by this Court on July 19, 2004. VBS's response was served on the Chapter 7 Trustee, the Chapter 7 Trustee's counsel and JAR's counsel.

26. VBS argues that "[b]ecause of the Trustee's inability to market the Assets and the desire to attempt to maximize the value of the Assets, the Trustee and VBS agreed to extend the Settlement Agreement and operate under its terms." (VBS's Resp. ¶ 6). In support of its position, VBS contends that a series of writings in the form of "email" communications between its counsel and the Trustee establish that such parties agreed to extend the Settlement Agreement and operate under its terms.

27. JAR filed a Memorandum in Support of the Trustee's Motion on October 18, 2005 arguing that pursuant to the express terms of the Settlement Agreement, VBS's right to credit bid expired as of December 31, 2004 and that VBS was deemed to have surrendered any claim in the Debtor's bankruptcy case as of January 15, 2005 when it failed to exercise its right to purchase the patent rights.

28. The Trustee's Motion was heard on October 19, 2005 and upon the Court's request was scheduled for an evidentiary hearing on November 18, 2005. At that time the Trustee, counsel for VBS, and counsel for JAR all appeared and testified. The Court took the matter under advisement to consider the documentary exhibits and testimony.

29. At that hearing Mr. Michael Shuster, one of JAR's attorneys, testified that although the September

---

**8.** The Settlement Agreement was an Exhibit to the Trustee's Motion to Approve Compromise Settlement and Mutual Release filed on June 10, 2004. Additionally, the Settlement Agreement was attached to the July 19, 2004 order granting the Trustee's Motion.

27, 2005 Letter Agreement specifically referenced the VBS Settlement Agreement, he had not then yet seen a copy of that document and understood from the Trustee that such agreement provided for a scheme of distribution applicable to such claim. He admitted that he was aware that a secured creditor generally has a right to "credit bid" in a bankruptcy sale pursuant to section 363(k) of the Bankruptcy Code. Accordingly, the Court finds that JAR, in entering into the Letter Agreement with the Trustee, did not rely upon the provisions of the Settlement Agreement which under their terms would have extinguished any rights of VBS in the property or the bankruptcy estate and that to the contrary it proceeded upon the understanding that whatever the rights of VBS might be under such Agreement, they continued to exist.

## CONCLUSIONS OF LAW

Upon these Findings of Fact, the Court makes the following Conclusions of Law:

1. This Court has jurisdiction of this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984.

2. The determination of appropriate bid procedures for a sale of property of the bankruptcy estate is a "core" bankruptcy proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

3. As the Trustee and counsel for VBS contend, Virginia law clearly permits the parties to a written contract to modify or amend its provisions either orally or by a course of conduct, even when the contract specifies that it can only be amended by a written document signed by both parties. *See Reid v. Boyle*, 259 Va. 356, 527 S.E.2d 137, 144–45 (2000).

4. In a bankruptcy case, however, when the Trustee has entered into a contract on behalf generally of the creditors of the bankruptcy estate after obtaining approval of the Court after a hearing upon notice to the creditors and other parties in interest, the right of the Trustee to agree to amend the provisions of that contract without notice to the creditors or approval of the bankruptcy court is subject to some limitations.[9] While the breadth of the Trustee's discretion to agree to modifications of such contracts may be difficult to define in the abstract, the Court concludes that a modification of a contract entered into after notice to those creditors and approval of the bankruptcy court which substantially and adversely affects the rights of those creditors under that contract on whose behalf the Trustee acts requires approval of the Court obtained after notice to the creditors and an opportunity to be heard. The Court concludes in this case that an extension of the deadlines in the Settlement Agreement after the two critical

9. *See* Fed. R. Bank. P. 9019; *see also Bezanson v. Bayside Enter., Inc. (In re Medomak Canning)*, 922 F.2d 895, 900–01 (1st Cir.1990) (recognizing that an order approving a settlement has the same res judicata effect as any other order of the court).

deadlines specified in such Agreement had already expired, which under the terms of that Agreement resulted in a bargained for abandonment by VBS of its rights in the principal asset of the bankruptcy estate and indeed its very claim in the case, was the type of modification which required notice to the creditors and court approval to be effective. The situation presented to this Court is far different, for example, than if the Trustee and VBS had agreed prior to December 31 that the Trustee needed more time to attempt to market the technology and the parties had agreed on a six month extension of the deadlines specified in the Agreement, or if, to take another example, VBS had actually tendered to the Trustee or his counsel the $50,000 agreed price to purchase the patent rights and the parties then had agreed that it was in their mutual interest to permit the Trustee to continue his sale efforts and had agreed to a specific extension of the rights granted to both parties under the Agreement. The Court recognizes that the Trustee's heart attack on December 14 and his inability to return to the office until after the expiration of the January 15 deadline for VBS to exercise its purchase right put both the Trustee and VBS in a difficult situation, one quite understandable in its human dimensions. Nevertheless, the situation VBS now finds itself in is due more to its own unwillingness to exercise the right granted to it under the Agreement should the Trustee not effect a sale by December 31, the "Sale Termination Date," than to the Trustee's unavailability for approximately a month following his heart attack. Because the Agreement required that any sale be actually made by December 31 and that prior court approval of the sale had to be obtained, it had to have been obvious both to VBS and the Trustee by the beginning of December, before the latter's heart attack, that a qualifying sale was not going to take place. Just prior to the expiration of the January 15 deadline specified in the Agreement, counsel for VBS reached an understanding with the Trustee's counsel, perhaps subject to the Trustee's approval, of an extension of the January 15 deadline to January 17. Nothing happened on that date or before it to change that status and VBS made no effort to exercise the important right granted it in the Agreement. Why this is so is not made clear by the evidence, but the Court infers that VBS had serious doubts whether the patent rights in fact had actual realizable commercial value and on a rationale of, as the proverb goes, "don't throw good money after bad", decided that it didn't want to put even more money out to try and see whether it might have more success than the Trustee in marketing the technology. No doubt this was a difficult decision for VBS to make, but having made it, whether consciously or by inattention to its own in-

terests, valuable rights became vested in the bankruptcy estate by reason of the Settlement Agreement. One of those rights is the one which VBS seeks to assert in the matter before the Court, namely, the right to credit bid up to $1.5 million, although interestingly it did not serve the Objection asserting such right upon either the creditors generally or the Creditors' Committee specifically.

5. Although the Trustee testified at the evidentiary hearing that he did not consider a VBS right to credit bid to be inconsistent with the bid procedures contained in the Letter Agreement with JAR, the Court concludes that in actuality it is. Section # 12(a) of such agreement provided that "a competing offer must be on the same terms and conditions as the offer set forth herein". Subsection (h) of such section further provides, "All bids at the Auction must be made in increments of $5,000 and shall be made in cash." The Court simply cannot square those provisions with a right to credit bid by a competing bidder, albeit one delayed until at least $100,000 has been reached. While the Bankruptcy Code quite reasonably and appropriately recognizes a right to credit bid pursuant to § 363(k), such fact cannot alter the economic realities that an auction sale in which one bidder is an existing lender who does not have to put up new money, but can rely upon money previously advanced and which the lender has no other actual way to recover, is not a sale in which the bidders are on a level playing field. Such a sale is like getting into an auction in which the other party is actually the owner of the property being sold, whose interest is not in actually obtaining the subject property but in playing poker to see what is the highest bid which the independent bidder is willing to make. In short, the owner wants to be not the winning bidder, but rather the next-to-last bidder to the highest bid any other cash bidder is willing to advance. It is quite evident from the documentation and VBS's course of conduct in this case that its sole interest is maximizing the value of its purported lien rights against the patents. It has only exhibited interest in actually making a bid to purchase the patents with "new" money when other potential purchasers have surfaced and has not demonstrated such interest when other interested parties were not to be found. There's certainly nothing wrong with that, but to accord VBS a right to credit bid inherently skews the proposed sale in which JAR agreed to act as a "stalking—horse" bidder, a status which JAR fully appreciated might prompt offers from other competing third party bidders, into quite a different auction sale than the one contemplated by and agreed to by the Trustee and JAR.

6. Even if the Court is in error in concluding that the Trustee did not have the authority to agree to an indefinite extension of the deadlines provided for after the two critical deadlines provided for in the Settlement Agreement had already expired, the Court concludes that VBS's later attempts to purchase the patents at a lower price

than the one which had been agreed to in the Settlement Agreement demonstrates that its counsel and VBS did not enter into a definite agreement with specific terms for the extension of the deadlines but rather simply agreed to continue to operate under the terms of the agreement, something like an employee continuing to work for an employer under existing terms of employment after an employment contract has expired. The problem with that is that VBS wanted to continue to operate under the Agreement when to do so served its economic interest but to operate outside of it (e.g., to make an offer of $25,000 to purchase the patent rights) when that seemed to serve better its economic interests. In summary, VBS wanted to stay "in the game" but without attempting to either comply with or enforce the terms of the Agreement which it had reached the preceding year with the Trustee. The Court concludes that such conduct results in an abandonment of the Agreement and of any right to demand the opportunity to "credit bid" against JAR's efforts to purchase the Debtor's technology rights.

7. VBS has challenged the standing of JAR, which after all is interested in removing from the playing field as much competition as possible, to challenge its right to credit bid at the auction. The Court concludes that the expenditures of effort and money made by JAR to reach the Letter Agreement with the Trustee and its contractual commitment under such agreement to purchase the assets to be sold for $52,000 or such higher price as it might be willing to offer at an auction sale with other bidders operating under precisely the terms and conditions set forth in the agreement, clearly give JAR standing to object to a modification of the agreed bid procedures which would give one potential bidder a right to compete against it on a "credit bid" rather than purely new cash basis.

8. It is only necessary for the Court at this point to deal with the asserted right of VBS to credit bid. The Court need not and does not decide here whether VBS retains any distribution rights under the Settlement Agreement.

9. By separate order the Court will approve the proposed bidding procedures generally. Due to the passage of time while the issue in dispute has been litigated and then determined by the Court, however, it is not possible to approve bid procedures which contemplate an actual sale hearing on December 7. Accordingly, in that respect only, the Court will deny approval and leave JAR and the Trustee to make an alternative proposal, if they agree to do so, which is feasible at this point in time and will result in the opportunity for a fully competitive auction sale of the patent rights of the nature originally contemplated by both JAR and the Trustee in the September 27 Letter Agreement to which they agreed.

## EXHIBIT A

### *SETTLEMENT AGREEMENT AND RELEASE*

This SETTLEMENT AGREEMENT AND RELEASE (the "Agreement") is entered into as of this 8th day of June 2004,

by ROBERT T. COPELAND, TRUSTEE of ANTAEUS TECHNICAL SERVICES, INC. (the "Trustee") and VBS INVESTMENTS PTY LTD. a/k/a VBS PTY, LIMITED ("VBS").

WHEREAS, on or about June 21, 1999, an involuntary petition for relief under Title 11 of the United States Code was filed against Antaeus Technical Services, Inc. (the "Debtor") in the United States Bankruptcy Court for the Western District of Virginia, Roanoke Division, sitting at Abingdon, Virginia (the "Bankruptcy Court"), assigned Case No. 99–02114 WSA–07 (the "Antaeus Technical Case").

WHEREAS, on November 24, 1999, an Order for Relief was entered adjudicating the Debtor as a debtor under Chapter 7 of the Bankruptcy Code.

WHEREAS, on November 24, 1999, an Order was entered converting the Antaeus Technical Case to a case under Chapter 11 of the Bankruptcy Code.

WHEREAS, on February 17, 2000, an Order was entered converting the Antaeus Technical Case back to a case under Chapter 7 of the Bankruptcy Code.

WHEREAS, on March 9, 2000, the Trustee was appointed and continues to act as Trustee in the Antaeus Technical Case.

WHEREAS, Antaeus Energy Corporation; Mineral Development Corporation; Resource Recovery II, LLC; Coal Recovery I, LLC; Coal Recovery II, LLC; Coal Recovery III, LLC; Greenfields Environment Recovery II, LLC: Antaeus Gary Projects, Inc.; and MDC of Illinois, LLC: affiliates of the Debtor, also are debtors under Chapter 7 of the Bankruptcy Code, at Case Nos.: 00–00070; 00–00071; 00–00072; 00–00073; 00–00074; 00–00075; 00–00076; 00–00077; 00–00078; (the "Other Cases").

WHEREAS, on June 5, 2000, VBS filed a proof of claim in the Antaeus Technical Case asserting that it has a secured claim against the Debtor in the amount of $8,334,800.04 plus interest, fees and costs (converted from $12,842,527.03 Australian dollars) (the "VBS Claim").

WHEREAS, VBS asserts that the VBS Claim is secured in substantially all of the remaining assets of the Debtor (the "Property").

WHEREAS, on March 7, 2002, the Trustee filed a Complaint against VBS at Adversary Proceeding No. 02–0029A (the "Complaint").

WHEREAS, on October 15, 2002, the Trustee filed an Objection to the VBS Claim (the "Objection").

WHEREAS, VBS filed various responses to the Complaint and the Objection.

WHEREAS, the Court has entered various orders with respect to the Complaint and the Objection.

WHEREAS, certain disputes with regard to the VBS Claim remain outstanding.

WHEREAS, the parties now wish to settle and resolve all disputes between them, including but not limited to such disputes and claims, as noted above, under the following terms and conditions.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and incorporating the recitals herein, the parties agree as follows:

1. The Trustee shall use his best efforts to obtain the approval of the Bankruptcy Court of a sale of the Property on or before December 31, 2004 (the "Sale Termination Date"). Recognizing that VBS has no special expertise or experience

in marketing assets similar to the Property, VBS shall use its best efforts to cooperate with the Trustee in marketing the Property.

2. If the Trustee is successful in consummating the sale of the Property prior to the Sale Termination Date, the Net Proceeds of sale shall be distributed as follows:

   a. The first $1,000,000 (less fees and all expenses of the Trustee which shall not exceed $100,000) shall be paid to VBS.

   b. Net Proceeds in excess of $1,000,000 shall be paid in $150,000 increments alternating between the Trustee on behalf of the bankruptcy estate and VBS with the first $150,000 increment or portion thereof being retained by the Trustee for the benefit of the bankruptcy estate (the "Estate"), the second $150,000 increment or portion thereof being paid to VBS, the Third $150,000 increment, or portion thereof being retained by the Trustee for the benefit of the Estate, and so on.

   c. "Net Proceeds" is defined as the total consideration received on the sale of the· Property less fees and expenses of any broker retained by the Trustee for purposes of selling the Property.

3. VBS waives any deficiency claim in the Antaeus Technical Case and will not receive a distribution from any of the sale proceeds retained by the Trustee for the benefit of the Estate as described above.

4. Any sale of the Property prior to the Sale Termination Date shall be subject to Bankruptcy Court approval.

5. VBS shall be entitled to credit bid up to $1,500,000 of its secured claim at any sale of the Property prior to the Sale Termination Date.

6. The Trustee intends to seek approval of the retention of a broker or agent to sell the Property (the "Broker"). VBS shall be permitted to communicate directly with the Broker concerning the Property, and the Broker shall provide VBS with any reports and analysis which it prepares or delivers to the Trustee.

7. If the Property is not sold prior to the Sale Termination Date, VBS shall have the following options:

   a. Paying the Trustee $50,000 in exchange for the Property being abandoned over to VBS, ("Option 1") or

   b. Releasing its lien on the Property and abandoning any claim that it has in the Antacus Technical Case ("Option 2").

If VBS elects Option 1, it must deliver the $50,000 payment to the Trustee on or before January 15, 2005. If VBS does not pay $50,000 to the Trustee on or before January 15, 2005, it shall be deemed to have chosen Option 2 and shall on or before February 15, 2005 formally withdraw the VBS claim and file and/or record all termination statements or other instruments or documents required to release its claim and security interests claimed in any of the Property.

8. The Trustee and VBS hereby each agree that this is a full and final settlement of any and all rights, claims, demands, debts, contracts, accounts, torts, misfeasance, malfeasance, costs, losses, expenses, obligations, causes of action, damages and liability of any kind or character whatsoever, whether known or unknown, matured or unmatured, asserted or unasserted, and whether legal, equitable or injunctive in nature arising out of or relating to the claims set forth above, it being the intent of the parties that they are each mutually releasing all past, present and

future claims. The parties further acknowledge that they are each sophisticated parties, represented by counsel, each with a detailed knowledge of such claims and the underlying facts relating thereto.

9. Effective upon the execution of this Agreement and except for rights and obligations arising hereunder, the Trustee and VBS, for themselves, their parent corporations, affiliates, subsidiaries, respective agents and employees, do hereby mutually release remise and forever discharge one another, their parent corporations, affiliates, subsidiaries, respective past, present and future officers, directors, employees, agents, attorneys, shareholders, consultants, personal representatives or assigns from any and all rights, claims, demands, debts, contracts, accounts, torts, misfeasance, malfeasance, costs, losses, expenses, obligations, causes of action, damages and liability of any kind or character whatsoever, whether known or unknown, matured or unmatured, asserted or unasserted, and whether legal, equitable or injunctive in nature arising out of the claims set forth above, which the Trustee and VBS ever had, now have, or which any of them hereafter can, shall or may have, whether such claims are presently known or unknown, it being the intent of the parties that they are each mutually releasing all past, present and future claims, even though such claims may not have been discovered or known as of the date this release is executed.

10. This Agreement is a compromise of disputed claims, and is being entered into solely to avoid the cost and uncertainty of litigation, and is not an admission of liability by either the Trustee or VBS.

11. This Agreement shall have no effect on or precedential value with regard to VBS' claims in the Other Cases.

12. Each of the parties hereto represent and warrant that they have been duly authorized to enter into this Agreement and have the consent of their respective officers and directors to this settlement.

13. The parties acknowledge that they are executing this Agreement of their own volition and after consultation with counsel, with a full understanding of its terms and effects. The parties acknowledge that no representations of fact or opinion have been made by any party to induce the execution of this Agreement.

14. This Agreement and the provisions contained therein shall not be construed or interpreted for or against any party hereto because said party drafted or caused the party's legal representative to draft any of its provisions.

15. The parties acknowledge that they may hereafter discover facts different from or in addition to those they now know or believe to be true with respect to the claims, causes of action, rights, obligations, costs, liabilities, damages, losses, and expenses herein released, and each party agrees that this Agreement shall be and remain in effect in all respects as a complete release as to all matters that have been released and that such matters are released notwithstanding discovery of any such different or additional facts.

16. This Agreement, and the terms and conditions hereof, shall be binding upon and inure to the benefit of the parties and to their respective successors and assigns. If any provision of this Agreement shall be or become illegal or unenforceable, in whole or in part, for any reason whatsoever, the remaining provisions shall nevertheless be deemed valid, binding, and subsisting.

17. This Agreement may be amended only by a writing signed by the party affected thereby and this Agreement shall

be governed and construed in accordance with the laws of the Commonwealth of Virginia.

18. Each party represents and warrants that it has not assigned, transferred, or purported to assign or transfer, in whole or in part, any interest in any of the rights and claims that are the subject of this Agreement.

19. This Agreement is complete and reflects the entire agreement of the parties with respect to the subject matter and supersedes all previous written or oral negotiations, commitments and writings.

20. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signature of each party.

ROBERT T. COPELAND, TRUSTEE of ANTAEUS TECHNICAL SERVICES, INC.

VBS INVESTMENTS PTY LTD. a/k/a VBS PTY, LIMITED

### EXHIBIT B

JAR ACQUISITION, LLC
c/o Hahn Loeser & Parks LLP
65 East State Street, Suite 1400
Columbus, Ohio 43215
Attn: Art T. Stein

September 27, 2005

Robert T. Copeland, Esq.
Chapter 7 Trustee
Antaeus Technical Services, Inc.
c/o Copeland & Bieger
212 West Valley Street
Abingdon, Virginia 24210

Dear Mr. Copeland:

This letter agreement ("Letter Agreement") sets forth the terms under which JAR Acquisition, LLC or its nominee (collectively, "JAR") offers to purchase certain assets of Antaeus Technical Services, Inc. a/k/a Antaeus CTC Technical Services, Inc. (the "Company" or "Debtor") from Robert T. Copeland, Chapter 7 Trustee (the "Trustee"), in the Chapter 7 bankruptcy case of *In re Antaeus Technical Services, Inc.*, Case No. 99–02114 (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Western District of Virginia, Roanoke Division (the "Bankruptcy Court"), JAR is a Delaware limited liability company, the ownership of which is held through certain affiliates of Nucor Corporation.

The terms of IAR's offer to purchase are as follows:

1. *Purchased Assets.* Subject to the terms and conditions hereof and on the basis of and in reliance upon the covenants, agreements and representations and warranties set forth herein, at the closing, the Trustee shall sell, convey, transfer, assign and deliver to JAR all of the Trustee's, the Debtor's and the Debtor's estates right, title and interest in and to the following assets:

(a) U.S. Patent No. 5,151,159, titled "Method and apparatus for converting coal into liquid fuel and metallurgical coke," and U.S. Patent No. 5,296,005, titled "Process for converting coal into liquid fuel and metallurgical coke" (collectively, the "Patents");

(b) all patents, patent applications, inventions (whether patentable or unpatentable), devices, conceptions or developments of the Company and its affiliates (but expressly excluding prototype equipment owned by affiliates of the Company), of or relating to the Patents, together with all

continuations, continuation-in-parts, divisional reexaminations, reissues, and foreign rights thereof, as well as all drawings, sketches, ideas, "know-how," proprietary information, documentation, correspondence, and records relating to the Patents and/or any of the other foregoing listed assets; and

(c) all income, royalties, damages and payments owing or recoverable by the Company and its affiliates, or the Trustee, in connection with the Patents, due and payable to, or subject to a claim for recovery by the Company or the Trustee as of the date of this Letter Agreement or thereafter (including, without limitation, damages and payments for past and future infringements or misappropriations thereof); together with the right to sue and recover for past infringement, license breaches or misappropriation thereof throughout the world, and copies of all documents regarding any of such rights.

All of the assets to be sold, conveyed, transferred, assigned and delivered at the closing by the Trustee to JAR are hereinafter referred to as the "Assets." If requested by JAR, any of the above-referenced Assets shall be conveyed to an entity other than JAR, as designated by JAR at or prior to the closing.

2. *Purchase Price.*

The purchase price for the Assets (the "Asset Purchase Price") shall be $52,000, payable in cash or other certified funds to the Trustee at closing.

3. *Non–Assumption of Liabilities: Conveyance of Assets.*

(a) JAR will assume no liabilities or obligations as part of the transaction (other than as specified in Paragraph 4 if and as applicable). Without limiting the generality of the foregoing, JAR shall not directly or indirectly assume or be respon-

sible for any liability, obligation, duty or contingency of the Debtor or the Trustee or any other party of any nature whatsoever whether liquidated or unliquidated, known or unknown, actual or inchoate, accrued, contingent or otherwise, and whether arising from facts existing or events occurring prior to, on or after the date of this Letter Agreement, or the closing, including, without limitation, (i) product liability for goods manufactured or shipped prior to closing; (ii) liabilities or obligations in respect of the storage, removal or disposal of hazardous substances or toxic waste or any other environmental liabilities created prior to closing; (iii) all employee and retires related liabilities, including, but not limited to, pension, severance, health and life insurance (including COBRA obligations), workers' compensation (including, the experience rating of Seller), accident and sickness benefits, and supplemental employment benefits; and (iv) any accrued liabilities or accounts payable of the Debtor or the Trustee.

(b) The Trustee shall deliver to JAR good and marketable title to the Assets, free and clear of any and all liens, claims, interests and encumbrances whatsoever, or charges of any kind or nature, whether known or unknown, except for the license of the DOE as acceptable to JAR, by a duly executed Bill of Sale, together with an Assignment of Patent Rights in form and substance acceptable to JAR in substantially the form attached hereto as Exhibit A, and pursuant to other necessary documentation to effect the transfer of any of the Assets, including but not limited to any necessary power of attorney, all in form and substance satisfactory to JAR's legal counsel, which Assets and required documentation shall be delivered to JAR at closing, and pursuant to the Bankruptcy Court Order described in Paragraph 5(d) hereof.

4. *Assumed Liabilities*—None.

NO LIABILITIES OF ANY KIND SHALL BE ASSUMED BY JAR IN CONNECTION WITH THE TRANSACTION CONTEMPLATED PURSUANT TO THIS LETTER AGREEMENT.

5. *Conditions to JAR's Obligations.* JAR's obligations to close the transactions contemplated hereby shall be contingent upon:

(a) None of the Assets will have been sold or disposed of, or encumbered, from the date of this Letter Agreement through the date of closing.

(b) Any and all obligations or liabilities in connection with the Patents shall have been paid, satisfied or otherwise resolved, including but not limited to any obligations or liabilities to the United States Patent and Trademark Office; and any and all possible rights of first refusal to purchase the Patents or other Assets shall have been eliminated, confirmed not to exist, or otherwise resolved, to the satisfaction of JAR in its sole discretion.

(c) The nature, extent and duration of the rights of the United States Department of Energy ("DOE") and any third parties in and to the Patents and the existence and/or conditions of any purported license(s) thereof shall be acceptable to JAR in its sole discretion; and the disposition of any objections to the sale of the Assets to JAR and the form and content of the Order (hereinafter defined) approving the sale shall be acceptable to JAR in its sole discretion.

(d) Approval by a final and non-appealable order of the Bankruptcy Court (the "Order") approving this Letter Agreement in all respects, and authorizing and confirming the sale to JAR of the Assets, free and clear of any and all liens, claims, interests and encumbrances whatsoever, or charges of any kind or nature, whether known or unknown, except for the license of the DOE as acceptable to JAR, pursuant to Sections 363(b), 363(f), 363(m) and, to the extent applicable, including, without limitation, making such findings and conclusions as to (1) the scope of the DOE's license concerning the Patents, and (2) the sale of the Patents free and clear of any other asserted licenses, or any asserted rights of first refusal to purchase any of the Assets, or other asserted claims; and which Order shall be final and non-appealable and in full force and effect at closing and shall not be vacated, reversed, modified, amended, stayed, under appeal or subject to appeal.

(e) There having occurred no (i) material adverse change in the Assets and no material adverse claim on, to or against the Assets, or (ii) dismissal of the Company's Chapter 7 case.

(f) Each and every warranty and representation of the Trustee, the Debtor and the Debtor's estate made pursuant to Paragraph 6 hereof shall be true and correct as of the closing date.

(g) The provisions of Paragraphs 3 and 13 hereof shall have been complied with and satisfied in full.

(h) Confirmation to the satisfaction of JAR in its sole discretion of the scope and validity of the Patents.

If JAR has not given the Trustee written notice of the failure to satisfy condition (h) set forth in this Paragraph 5 on or before the date of the Hearing described in Paragraph 7(b) hereof, such contingency concerning condition (h) shall be deemed to be eliminated and of no further force or effect. Any such conditions concerning condition (h) for which notice has been given to the Trustee of his failure to satisfy, or conditions otherwise indicated in this Paragraph 5, shall not be deemed waived

or eliminated unless subsequently waived or eliminated in writing by JAR, and shall continue to be a condition to JAR's obligation to close the transaction until satisfied or waived by JAR.

6. *Warranties and Representations.* As a material inducement to enter into the transactions contemplated hereby, the Trustee, the Debtor and the Debtor's estate represent and warrant to JAR as of the date hereof and as of the closing date:

(a) The Assets being conveyed to JAR include all of the intellectual property necessary for application and utilization of the Patents. To the best knowledge of the Trustee, the Company has good title to all the Assets, and the Company is the owner of all right, title and interest in and to the Patents, free from the obligation of any license or encumbrance whatsoever (including, but not limited to, any judgment liens and any licenses or other asserted rights), other than a certain license to the DOE in connection with the Patents. Neither the Company nor the Trustee is prohibited from transferring the Patents to JAR, and the transfer thereof shall not give rise to any rights in favor of third parties with respect to the Patents or for recovery against JAR.

(b) Subject only to the entry by the Bankruptcy Court of the Order (as defined herein), the Trustee has all requisite corporate power and authority to execute, deliver and perform its obligations hereunder and any other agreements and instruments to be entered into by the Trustee in connection herewith. The execution, delivery and performance of this Letter Agreement and all such other agreements and instruments have been duly authorized and approved by all necessary action on behalf of the Company and the Trustee, including but not limited to any necessary approval from the unsecured creditors of the Company serving on a committee in connection with the Bankruptcy Case pursuant to Bankruptcy Code Section 702. This Letter Agreement is, and any such other agreements and instruments are or upon their execution and delivery by the Trustee will be, the valid and binding obligations of the Trustee, the Debtor, and the Debtor's bankruptcy estate, enforceable in accordance with their respective terms.

(c) The Company and the Trustee have not received any claim or threat that the Company or the Trustee has breached, nor has the Company or the Trustee done or failed to do any act which by lapse of time or notice or both would constitute a breach or default under, any of the terms or conditions of any contract or agreement pertaining to the Assets to which the Company or the Trustee is a party or by which the Company or the Trustee is bound, except for the commencement of the Debtor's Chapter 7 case and the alleged breach by the Trustee of ongoing marketing requirements of the Debtor's remaining assets pursuant to the terms of a settlement reached between the Trustee and VBS Investments Pty., Ltd. ("VBS") in connection with the secured claim of VBS.

(d) There is no basis known to the Company or the Trustee for the Patents to be invalid.

The obligations of JAR hereunder are subject to the condition that each of the representations and warranties of the Trustee, the Debtor and the Debtor's estate contained herein shall be true and correct on the closing date with the same effect as if made on and as of such date.

7. *Acceptance and Motion to Sell.*

(a) Written acceptance of this offer shall be accomplished by signing on the appropriate signature line at the end of this Letter Agreement, and delivering this Letter Agreement to counsel for JAR on

or before Thursday, September 29, 2005, after which time this offer expires unless extended in writing by JAR.

(b) Immediately upon written acceptance of this offer by the Trustee, and in all events on or before Friday, September 30, 2005, the Trustee shall file a motion with the Bankruptcy Court, in form and substance reasonably satisfactory to JAR's legal counsel, for approval of this Letter Agreement and the sale of the Assets to JAR in accordance herewith and for the issuance of an Order as described in Paragraph 5(d) above. The Trustee shall cause the Hearing on such motion to be held at the earliest practicable date and in all events within thirty (30) days of the date the motion is filed, unless otherwise agreed by JAR. If the Trustee does not so file a motion or cause the Hearing on this offer to be so held, this Letter Agreement shall at JAR's option become null and void upon written notice to the Trustee.

(c) Immediately upon written acceptance of this offer by the Trustee, and in all events on or before Friday, September 30, 2005, the Trustee shall file a motion (which motion may be combined with the motion described in Paragraph 7(b) above) with the Bankruptcy Court, in form and substance reasonably satisfactory to JAR's legal counsel, seeking expedited approval of the non-consummation payment and bidding procedures set forth in Paragraphs 11 and 12 hereof. In the event the Bankruptcy Court does not enter an order approving such payment and procedures at least eleven (11) days prior to the date of the hearing on the motion described in paragraph 7(b) hereof, JAR's obligations under this Letter Agreement, at JAR's sole option, shall immediately terminate.

8. *Closing.*

(a) Provided other conditions and contingencies of this Letter Agreement are satisfied, the purchase and sale which is the subject of this offer shall close no later than five (5) days after the expiration of the 10–day appeal period following the issuance of the Bankruptcy Court order authorizing this Letter Agreement and the transactions contemplated herein and the Asset Purchase Price shall be paid at closing; *provided, however,* that JAR shall have the right in its sole discretion at any time subsequent to the entry of a Bankruptcy Court order approving the transactions provided for herein and prior to the expiration of the applicable appeal period to require the Trustee to consummate such transactions regardless of the pendency of an appeal of such order, unless on such date implementation of such order has been stayed by the Bankruptcy Court. If the closing has not occurred by such date through no fault of JAR, JAR shall have the sole option, in its sole discretion, to terminate this offer. Time is of the essence.

(b) In the event the Trustee fails to support this transaction before the Bankruptcy Court, or the Bankruptcy Court does not enter an order approving the sale of the Assets to JAR in accordance with the terms of this Letter Agreement within sixty-five (65) days from the date of written acceptance of this offer by the Trustee, or in the event the Hearing is canceled, stayed, or continued for any reason, or in the event a timely appeal of the Order authorizing the sale of the Assets to JAR in accordance herewith is filed, JAR may, at its sole option, by written notice to the Trustee terminate this Letter Agreement. In such case, neither party shall have any further obligation to the other hereunder, except for obligations of the Trustee, the Debtor and the Debtor's estate to JAR under Paragraph 11.

9. *Notices.* All notices and other communications hereunder shall be in writing and shall be (1) personally delivered; (2) sent by certified mail, return receipt requested; or (3) sent by overnight courier with confirmation of delivery, addressed as follows:

To the Trustee:

Robert T. Copeland, Esq.
Chapter 7 Trustee
Antaeus Technical Services, Inc.
c/o Copeland & Bieger
212 West Valley Street
Abingdon, Virginia 24210
Telephone: (276) 628–9525
E–Mail: rcopeland@copelandbieger.com

To JAR:

Mark M. Brandon
Vice President
JAR Acquisition, LLC
c/o Art T. Stein, Esq.
Hahn Loeser & Parks LLP
65 East State Street, Suite 1400
Columbus, Ohio 43215
Telephone: (614) 221–5104
E–Mail: mbrandon@nucor.com
astein@hahnlaw.com
arland.stein@gmail.com

With copy to:

Art T. Stein, Esq.
Hahn Loeser & Parks LLP
65 East State Street, Suite 1400
Columbus, Ohio 43215
Telephone: (614) 221–5104
E–Mail: astein@hahnlaw.com
arland.stein@gmall.com

-and-

Lawrence E. Oscar, Esq.
Michael P. Shuster, Esq.
Hahn Loeser & Parks LLP
3300 BP Tower
200 Public Square
Cleveland, Ohio 44114–2301
Telephone: (216) 274–2485
E–Mail: mpshuster@hahnlaw.com

Any notice delivered under this Agreement shall be deemed effective (a) upon delivery if hand delivered, and (b) upon the date of delivery indicated on the return receipt, if mailed, or as confirmed in writing by an overnight courier. The addresses listed above may be changed by written notice to the other party as provided in this Paragraph.

10. *Further Assurances.* At or after closing, the Trustee shall from time to time, at JAR's reasonable request, execute and deliver to JAR such additional documents and instruments of conveyance and transfer and take such other action as JAR may reasonably request or as may be requested by the United States Patent and Trademark Office so as to more effectively sell, transfer, assign and deliver and vest in JAR title to and possession of the Assets and otherwise to consummate the contemplated transactions.

11. *Non–Consummation Payment.* JAR and the Trustee hereby acknowledge and agree that the execution and delivery by JAR of this offer may result in competing offers of greater aggregate value to the Trustee and the Debtor's bankruptcy estate, and that there is significant value and benefit to the Trustee, the Debtor and the Debtor's bankruptcy estate in having received such offer and in having JAR pursue the proposed transaction to the benefit of the Trustee, the Debtor and the Debtor's bankruptcy estate. The parties also acknowledge that JAR has and will continue to incur significant expense and expend management resources in the pursuit of this transaction and in the preparation of this offer. Accordingly, the parties hereto agree, subject to Bankruptcy Court approval, that the Trustee shall pay to JAR $22,500 in the event that (i) a competing offer is approved by the Bankruptcy Court as provided in Paragraph 12; (ii) the Trustee withdraws its motion to the Bankruptcy Court for approval of this Letter Agreement; or (iii) the Trustee fails or refuses to close the transactions contemplated hereunder upon receiving Bankruptcy Court approval. The above payment shall be payable immediately, without necessity for further order of the

Bankruptcy Court, as an administrative expense with a priority superior to that of any other expense of the estate. In the event the transactions contemplated herein are consummated between the Trustee and JAR, no payments described in this Paragraph 11 shall be paid to JAR.

12. *Bidding Procedures.* To ensure that the Trustee is able to maximize the recovery for the Debtor's estate and to provide an orderly process for receiving competing offers, the Trustee and JAR agree to the following bidding procedures:

(a) a competing offer must be upon the same terms and conditions as the offer set forth herein (and, accordingly, piecemeal bids shall not constitute competing offers) and must state that the offeror is prepared to execute upon the entry of an order of the Bankruptcy Court approving the sale, a purchase agreement substantially in the form of this Letter Agreement;

(b) a competing offer must be accompanied by a $15,000 deposit in the form of a cashier's check payable to the Trustee and to be held in escrow by the Trustee, with such deposit to be refunded to the competing offeror unless such offeror breaches its obligations to the Trustee under such competing offer;

(c) a competing offer must be for a total amount in cash of at least $25,000 in excess of the Asset Purchase Price set forth in Paragraph 2 of this Letter Agreement and the total amount of the bid paid within five (5) days of acceptance by the Trustee of the bid;

(d) a competing offer must state that it constitutes a binding offer and will remain in effect through 5:00 p.m. E.T. on the sixteenth (16) business day following the date of the hearing on the sale motion;

(e) a competing offer may not be subject to further due diligence and must not contain any conditions or contingencies other than those set forth in this Letter Agreement which have not been eliminated on or before the date of the Hearing;

(f) a competing offer must state that the offeror is prepared to communicate the transaction within eleven (11) days of the entry of an order of the Bankruptcy Court approving the competing offer;

(g) a competing offer must be in writing and delivered to the Trustee and JAR and filed with the Bankruptcy Court by 5:00 p.m. E.T. five (5) days prior to the sale hearing;

(h) in the event that a competing offer acceptable to the Trustee is submitted, the Trustee (under the direction and supervision of the Court) will conduct an auction (the "Auction") at the sale hearing. Bidding at the Auction will be limited to those persons or entities who submitted competing offers and on JAR. All bids at the Auction must be made in increments of $5,000 and shall be made in cash.

13. *Pre–Closing Access.* A representative of JAR shall be given complete access to the Assets from the date of acceptance of this Letter Agreement through the date of closing.

14. *Post–Closing Access.* Following closing, the Trustee and his representatives shall have reasonable access to the books and records of the Company sold to JAR hereunder during regular business hours and upon reasonable prior notice to JAR. If JAR determines that it no longer requires any such records, it shall give the Trustee written notice and the Trustee shall have thirty (30) days from its receipt of such notice to remove such records (or part thereof) that JAR no longer requires. Any such records not so removed by the

Trustee may be destroyed by JAR after such thirty (30) day period.

If the foregoing is acceptable to the Trustee, subject only to the necessary Bankruptcy Court approval, please sign in the space provided below and return an executed copy to counsel for JAR.

Sincerely yours

JAR ACQUISITION, LLC

By: Mark M. Brandon, Vice President

ANTAEUS TECHNICAL SERVICES, INC.

By: Robert T. Copeland, Esq., Chapter 7 Trustee for Antaeus Technical Services, Inc.

Date signed: September 27, 2005.

### Exhibit A.

#### ASSIGNMENT OF PATENTS

In consideration of the payment by AS-SIGNEE to ASSIGNOR (as both hereinafter defined) of the sum of Ten Dollars ($10.00), the receipt of which is hereby acknowledged, and for other good and valuable consideration,

ASSIGNOR:

| | |
|---|---|
| Owner's Name | Robert T. Copeland, Esq., Chapter 7 Trustee for Antaeus Technical Services, Inc. (a/k/a Antaeus CTC Technical Services, Inc.) |
| Owner's Address | c/o Copeland & Bieger 212 West Valley Street |
| City, State and Zip Code | Abingdon, Virginia 24210 |

hereby sells, assigns and transfers to

ASSIGNEE:

| | |
|---|---|
| Assignee's Full Name | JAR Acquisition, LLC |
| Assignee's Address | _____ |
| City, State and Zip Code | _____ |

and the successors, assigns and legal representatives of the ASSIGNEE, the entire right, title and interest in and to the following United States Patents (collectively, the "ASSIGNED PATENTS"):

| U.S. Patent No. | Title |
|---|---|
| 5,151,159 | Method and apparatus for converting coal into liquid fuel and metallurgical coke |
| 5,296,005 | Process for converting coal into liquid fuel and metallurgical coke |

ASSIGNOR hereby covenants that no assignment, sale, agreement or encumbrance has been or will be made or entered into which would conflict with this assignment.

ASSIGNOR further covenants that AS-SIGNEE will, upon its request, be provided promptly with all pertinent facts and documents relating to said ASSIGNED PATENTS and legal equivalents as may be known and accessible to ASSIGNOR and will testify as to the same in any interference, litigation or proceeding related thereto and will promptly execute and deliver to ASSIGNEE or its legal representatives any and all papers, instruments or affidavits required to maintain and enforce said ASSIGNED PATENTS and which may be necessary or desirable to carry out the purposes thereof.

IN WITNESS WHEREOF, the AS-SIGNOR has executed this ASSIGN-MENT OF PATENTS on the _____ day of _____, 2005.

"ASSIGNOR"

ANTABUS TECHNICAL SERVICES, INC.

By: _____
Robert T. Copeland, Chapter 7 Trustee for Antaeus Technical Services, Inc.

STATE OF _____ )
                                                              )  ss.
COUNTY OF _____ )

On this _____ day of _____, 2005, before me, a Notary Public, personally appeared Robert T. Copeland, known to me (or proved to on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as Chapter 7 Trustee, on behalf of Antaeus Technical Services, Inc., and that by his signature on

the instrument, the person, or the entity upon behalf of which the person acted, executed this instrument.

WITNESS my hand and official seal.