COURT OF APPEALS OF VIRGINIA

Present:   Judges Ortiz, Frucci and Bernhard
Argued at Fairfax, Virginia

UNPUBLISHED

NB 333 W. CORK STREET, LLC

                                        MEMORANDUM OPINION* BY
v.        Record No. 0336-24-4            JUDGE DANIEL E. ORTIZ
                                             SEPTEMBER 2, 2025
GREENFIELD HOLDINGS, LLC, ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF WINCHESTER
Alexander R. Iden, Judge

Christopher D. Davis (Justin R. Burch; Nathan M. Hernandez; Davis,
Burch & Abrams, on briefs), for appellant.

Stephen Nichols (John C. Monica, Jr.; Frances C. Wilburn; Offit
Kurman, PA, on brief), for appellees.


This case concerns a build-to-suit renovation project and long-term lease for an assisted

living and memory care facility in Winchester, Virginia.  When the designs became too costly,

Greenfield Senior Living, Inc. walked away from the project and ultimately asserted that the

lease was an unenforceable agreement to agree.  The circuit court agreed and struck NB 333 W.

Cork Street, LLC's ("Cork") breach of contract claim.  The court also struck Cork's fraudulent

inducement and, in the alternative, fraud claims.  Although there was evidence that Greenfield[1]

withheld information surrounding its overstated financial health, the circuit court found that there

was no prima facie showing of a misrepresentation of a material fact.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Unless individual identification is necessary, we will collectively refer to Greenfield
Senior Living and its pertinent subsidiaries as "Greenfield."  *See infra* note 4.

We find that the circuit court erred.  The lease here was not an unenforceable agreement to agree because it provided reasonably certain terms defining the subject matter of the agreement, describing the parties' essential commitments, and outlining the methods or formulas to determine the amounts payable.  Cork also presented prima facie evidence that Greenfield knew that Cork was relying on an inaccurate depiction of Greenfield's financial viability and that Greenfield did not correct otherwise misleading information until after the parties negotiated and signed the lease and lease amendment.  In the light most favorable to Cork, this amounted to a misrepresentation of a material fact which is required to prove fraud or fraudulent inducement.  We accordingly reverse the circuit court's judgment and remand the case for a new trial.

## BACKGROUND[2]

### I.  Parties

Greenfield Senior Living, Inc. is a parent company in Virginia owned entirely by Mathew Peponis.  Peponis is the primary decision-maker for the parent company and all of its subsidiaries discussed below.  Greenfield Senior Living has no employees other than Tom Scanlon, whom Peponis appointed as the chief financial officer.  All of its employees instead work under a subsidiary, Greenfield Management.  Greenfield Senior Living's business model is to buy or lease distressed buildings, fix them, and then launch new profitable communities.  By 2016, Greenfield Senior Living renovated and ran around 21 facilities.  For each facility, Greenfield Senior Living creates a new limited liability company—the property being its only asset—to serve as a shell company and leaseholder.  All revenue from the individual properties automatically rolls up to Greenfield Senior Living's "mecca" bank account.  Greenfield Senior

---

[2] "On appeal, when this Court reviews a trial court's decision to strike a plaintiff's evidence, we likewise view the evidence in the light most favorable to the plaintiff."  *Volpe v. City of Lexington*, 281 Va. 630, 639 (2011) (quoting *TB Venture, LLC v. Arlington Cnty.*, 280 Va. 558, 563 (2010)).

Living then distributes money to the subsidiaries for employee payroll, expenses, and other financial obligations.

Cork is an Illinois limited liability company with its principal place of business in Winchester, Virginia. Cork is co-owned by Todd Bryant and Gerald Nudo, who serve as principals and managers. Bryant is Cork's day-to-day developer and manager, and Nudo provides capital and general oversight. Bryant is also the founder of Healthcare Development Partners ("HDP"), a full-service national real estate investment and development firm that specializes in healthcare real estate. Cork is an affiliate of HDP. Joshua Teague is the HDP project executive overseeing the project in this case.

## II. Negotiation and Finances

Cork owns an older building in Winchester. It is a seven-floor, 150,000-square-foot building that used to be a 400-bed medical center. The building has two tenants—Valley Health System and Blue Ridge Hospice—that use part of the space.

In the summer of 2015, a broker on behalf of Cork approached Greenfield Senior Living with a proposed build-to-suit assisted living and memory care facility in the Winchester building. The proposed facility would be built on part of the ground floor lobby and first floor, and all of the fifth, sixth, and seventh floors. It would consist of around 52,733 square feet of rentable space after some major renovations. Around December 17, 2015, Cork and Greenfield Senior Living signed a non-binding letter of intent for the project.

Bryant then contacted Peponis for Greenfield Senior Living's financial data. Peponis introduced Bryant to Scanlon as Greenfield Senior Living's chief financial officer and point of contact for all financial information. On December 22, 2015, Scanlon emailed Bryant with Greenfield Senior Living's audited financial statements for 2013 and 2014 ("2014 audited

financial statements"). [3] Evaluating the company through June 29, 2015, the 2014 audited financial statements showed that Greenfield Senior Living's 2013 total stockholder equity was $11.9 million, and its 2014 total stockholder equity was $14.9 million. Satisfied with the numbers, Cork continued lease negotiations.

Shortly before the lease was signed, Greenfield Senior Living created a shell entity—Greenfield Assisted Living of Winchester, LLC—to be the leaseholder. [4] On March 15, 2016, Cork and Greenfield Assisted Living of Winchester signed a "Deed of Lease." Bryant signed for Cork, and Peponis signed for Greenfield Assisted Living of Winchester. Peponis, for Greenfield Senior Living, also signed a lease guaranty in March 2016.

Then, in April 2016, Cork asked Greenfield for its updated financial information for 2015. Because Scanlon was out of the office, Greenfield's director of finance, Robert Dill, emailed Teague an unaudited "Balance Sheet" of Greenfield Senior Living's 2015 finances. The summary, labeled "For Management Purposes Only," showed $25.9 million in total stockholder equity, a 60% increase from 2014, even after $7.8 million in distributions to its members. Dill also attached an Excel file named "Statement of Income (Loss) – Actual Summary CP CY.xls." [5] Scanlon was copied on the email. Teague responded to Dill and Scanlon on the same day asking for an explanation of the loss in 2014, a forecast for 2016, and the company's overall five-year

---

[3] The attached auditors' report said that "the consolidated financial statements . . . present fairly, in all material respects, the financial position of [Greenfield Senior Living, Inc. and its subsidiaries] as of December 31, 2014 and 2013." It was issued to Greenfield Senior Living on June 29, 2015, and said, "Management has evaluated subsequent events through June 29, 2015, the date the financial statements were available to be issued."

[4] Greenfield Assisted Living of Winchester, LLC is a subsidiary of Greenfield Holdings, LLC. Greenfield Holdings, LLC is a subsidiary of Greenfield Management, which is a subsidiary of Greenfield Senior Living, Inc.

[5] We collectively refer to these documents as the "2015 unaudited financial statements."

"game plan." Cork did not introduce Greenfield's response, if any, at trial. But emails between Cork and Greenfield showed that Cork was nonetheless encouraged by the overall numbers.

On May 12, 2016, the parties signed a lease amendment. The amendment did not materially change the lease other than reflecting Cork's selection of Durham Construction as the contractor for the project. The project discussions continued.

On May 20, 2016, Teague emailed Scanlon and Dill asking if their 2015 audited financial information was available yet to "update . . . the internal financials that [Cork] currently [had]." Scanlon quickly responded with the audited statements for 2014 and 2015 ("2015 audited financial statements").[6] The audited statements showed a total stockholder equity of $7 million, much lower than the $25.9 million in the documents Dill sent a month earlier. Concerned, Teague requested an explanation from Scanlon. He also said, "[T]he potential for any additional security beyond a standard lease guaranty really hinges on us fully understanding your financial picture." Scanlon responded,

> [W]e spent yesterday working with our external auditors. You must understand that we don't regularly share interim financials externally and the nature of some of our jv relationships creates some eliminations and other cleanup. . . . We will be in a position to share more information early next week.

Scanlon emailed Teague a detailed summary two weeks later. Scanlon described four events that reshaped Greenfield's equity: (1) Greenfield added six new, but unstabilized, leased properties on March 31, 2015, increasing the year-over-year lease costs by $4.9 million; (2) Greenfield sold two of its properties for $9.9 million on June 17, 2015, and chose to distribute much of those proceeds to Peponis and David McHarg, thus impacting the total equity by $4.4 million; (3) McHarg, an 18% interest member, left Greenfield on July 21, 2015, and

---

[6] The attached auditors' report said that "the consolidated financial statements . . . present fairly, in all material respects, the financial position of [Greenfield Senior Living, Inc. and its subsidiaries] as of December 31, 2015 and 2014."

Greenfield bought back his $4.4 million in shares; and (4) Greenfield refinanced the mortgages on four of its properties on February 5, 2016, providing a $10.6 million cashout, $2.6 million of which was distributed to shareholders and the remaining $8 million was set aside in an investment account. Scanlon nonetheless assured Teague that none of the events would "call into question the long term health of the company."

The parties met shortly after. To assuage Cork and encourage moving forward with the project, Peponis reiterated that Greenfield Senior Living was financially healthy. He also purportedly said that he was personally very wealthy so he could sign a personal guaranty and cover the rent and construction costs if needed. Cork agreed and asked for Peponis's personal financial statements. But Peponis ultimately never supplied his personal statements and did not sign a personal guaranty. Even so, Cork believed that it was bound by the lease and thus committed to the project.

### III. The Lease

Article 4 of the lease sets out a collaborative process to renovate the facility. Under Section 4.01 ("Landlord's Improvements"), Cork must pay for "all of the material, labor, and equipment for the [improvement] construction" listed in Exhibit C. Exhibit C lists six specific improvements that Cork will handle and one catch-all to "remedy any unforeseen existing conditions." Under Section 4.02 ("Tenant's Improvements"), "[Cork] will cause to be constructed certain initial improvements to the Premises,"[7] called the "Tenant's Improvements." It then details a two-step method for completing the Tenant's Improvements, including each party's responsibilities.

---

[7] The lease defines the "Premises" as: "Those certain premises located on the ground floor, first (1st), fifth (5th), sixth (6th) and seventh (7th) floors of the [b]uilding," which totals around 52,733 square feet.

First, once both parties approve the "Space Plan," Cork must "cause [d]esign [d]evelopment [d]ocuments . . . to be prepared in accordance with the Space Plan."  To that end, Cork and Greenfield agree "to engage in a cooperative effort with input from the [general] [c]ontractor" so that the "estimated total cost" of the improvements "will be approximately [$87] per square foot of the Premises."[8]  Cork must submit the design development documents to Greenfield for approval within 60 days of signing the lease.  Greenfield cannot withhold its approval of the design development documents "except for just and reasonable cause and will not act in an arbitrary or capricious manner" with respect to approving the documents.  After receiving the design documents, Greenfield has five business days to approve or disapprove them; if Greenfield does not timely respond, the documents will be considered approved.

Second, once the design development documents are approved, Cork must "cause final plans and specifications . . . to be prepared in accordance with . . . [the] [d]esign [d]evelopment [d]ocuments."  Again, Cork and Greenfield, with the general contractor, agreed to prepare the plans "in a cooperative effort."  The final plans must also "include a mutual agreement on the total cost (the "Final Budgeted Cost") for the work contemplated."  Cork and Greenfield must sign a summary of the final costs, "which may be more or less than the target of [$87] per square foot."

Cork must submit these final plans and specifications to Greenfield for approval within 90 days of the date the design development documents are approved.  Greenfield cannot withhold its approval of the design development documents "except for just and reasonable cause and will not act in an arbitrary or capricious manner" with respect to approving the plans. After receiving the final plans, Greenfield has five business days to approve or disapprove them; if Greenfield does not timely respond, the plans will be considered approved.  "Promptly

---

[8] Cork is solely responsible for selecting the general contractor.  *See* Section 4.02(a)(ii).

- 7 -

following such approval," Cork's chosen architect must review, seal, and submit the final plans for permits and construction bids. "The final contract price [Cork] negotiates may be more or less than the Final Budgeted Cost."[9] The lease then explains certain terms pertinent to the agreement and renovation process.

The final budgeted costs "set the amount of the [c]onstruction [d]eposit," which is the amount Greenfield must pay toward the costs of the overall improvements. This amount "shall equal the excess of: (i) the [f]inal [b]udgeted [c]ost (on a per square foot basis), over (ii) [$66.67] per square foot, multiplied by the final square footage of the Premises." But "[i]n no event will the [c]onstruction [d]eposit be less than [$1 million]." For the deposit, Greenfield must pay (a) $200,000 to an escrow agent within three business days after the lease date, and (b) the remaining balance within ten business days after Cork and Greenfield agree on the final budgeted cost.[10] The escrow agent will then disburse the funds to Cork "on a percentage of completion basis," based on the architect's certification, but not more than once a month, to help cover the costs of the improvements. Even so, the escrow agent cannot disburse the final 15% of the deposit to Cork until the architect certifies that the improvements are substantially complete. Substantial completion of the improvements occurs when the architect certifies that Cork's work under the final plans and specifications "ha[s] been constructed" and the facility is ready for its intended use—an assisted living and memory care facility.

Upon substantial completion of the improvements, the lease term begins and continues for 20 years. During the lease term, Greenfield pays annual "base rent," defined as "the sum of: (a) $12.00 multiplied by the square footage of the Premises; and (b) seven percent (7%) of the

---

[9] This provision also says that "[Greenfield's] Construction Deposit will not be impacted by any difference in the contract price nor by any cost overruns thereafter, unless caused by [Greenfield's] revisions under Section 4.02(b)."

[10] Greenfield deposited the $200,000 to an escrow account on March 15, 2016.

product of: (i) $66.67; and (ii) the square footage of the Premises." The base rent then increases by a cumulative 2% each year.

IV. Design, Development, and Construction

The lease sets out a collaborative multi-step renovation process. Peponis insisted that Cork hire Wade Hallock and the Hallock Design Group for the interior design.[11] Cork acquiesced. Cork also hired Proteus Group, owned by Frank Talbert, for the architecture work.[12]

Issues arose with the project almost instantly. In short, Peponis and Hallock had an unwavering luxury vision for the facility, called "Greenfield 2.0," but Hallock had never designed a senior living facility. According to Talbert and Bryant, Hallock's work was inept and difficult to understand. For example, Talbert explained that not only did it take Hallock months to prepare the space plan, something Talbert believed should take as little as a day, but the plan was unusable because it provided no information or specifications beyond a furniture layout. Hallock and Peponis also insisted on aesthetic designs that Proteus could not functionally achieve and that the contractors and subcontractors could not accurately price. For instance, Hallock and Peponis wanted farm-to-table dining, spa tubs, lavish decorations, and expensive finishing materials and fixtures. They also wanted individual thermostats for each room and 100% fresh air, both of which required fully redoing the building's HVAC system and ductwork. Assisted living facilities likewise prefer specific, wall-mounted rear-flushing toilets and require

---

[11] Unbeknownst to Cork, Greenfield had already hired Hallock and the Hallock Design Group for the project on January 15, 2016, before the lease was signed.

[12] According to Bryant, Proteus Group was capable of handling all the architecture and interior design, but Peponis was adamant that Hallock was necessary because they shared the same vision for the project.

space for outdoor exercise.[13]  This luxury vision and difficulty preparing adequate design documents caused substantial delays and swelled costs.[14]

On August 30, 2016, the parties signed a "Tenant Estoppel Certificate" because, in part, they were beyond the 60-day deadline for the initial design documents.  The certificate declared that the lease remained in full force and effect and that neither party was in default.  It also reiterated that the lease was the complete agreement between the parties.

As of August 30, 2016, the project budget was already around $97 per square foot, well above the parties' mutual intent to create design development documents with a total cost of "approximately [$87] per square foot."  By September 20, 2016, the budget was at $114 per square foot.[15]  Addressing Greenfield's complaints that the project was way over budget, Cork worked with Greenfield to reduce costs and agreed to cover more of them.  Scott-Long Construction started demolition in October 2016.  Cork and Scott-Long prepared another budget in February 2017.  The total budget was $7.7 million, which amounted to $148 per square foot. Cork again approached Greenfield with ideas to reduce costs, such as using the existing mechanical system, ending the relationship with Hallock, and using different materials, finishes, surfaces, fixtures, and other amenities.  Greenfield rejected them all.  Greenfield then asked Cork to forget all the designs up to that point and provide a design at the $87 per square foot figure. Cork declined.  In April 2017, Greenfield hired an outside contractor to run a budget for the

---

[13] A contractor also discovered asbestos in the building, which needed remediation.  Cork agreed to absorb those expenses as required by the lease.

[14] In fact, Peponis's and Hallock's designs caused internal conflict among Greenfield employees as early as February 2016.  Kristen Bolling, Greenfield Management's vice president of asset management, testified that Peponis's design plans and initial estimates were always significantly higher than expected and that it was everyone else's responsibility to make them work within the budget and regional market.

[15] On the same day, because of issues with Durham Construction, Cork fired it and hired Scott-Long Construction.

project, which came out to $11.8 million, or $223.77 per square foot.  Unable to reach an agreed-upon design, the project stalled.

By June 2017, 14 months after signing the lease, none of the construction documents were done.  On June 27, 2017, Greenfield sent Cork a notice of default claiming that Cork did not engage in a cooperative effort to prepare the design development documents.  Cork then stopped demolition.

## V.  Litigation

On July 27, 2017, Greenfield Assisted Living of Winchester sued Cork in the Winchester Circuit Court for breach of contract and fraud in the inducement.  It later amended its complaint.  Cork counterclaimed for breach of contract, fraudulent inducement, and, in the alternative, fraud.  In January 2019, after the circuit court granted its joinder motion, Cork amended its counterclaim to include the same claims against Greenfield Assisted Living of Winchester, Greenfield Holdings, Greenfield Senior Living, and Peponis.

After years of litigation, Cork's second amended counterclaim, filed on February 4, 2022, became the operative pleading.  The counterclaim asserts breach of contract, fraudulent inducement, and, in the alternative, fraud against Greenfield Assisted Living of Winchester, Greenfield Holdings, Greenfield Senior Living, and Peponis.  In its request for relief, it asked the court to pierce the corporate veil and hold Peponis and the Greenfield entities jointly and severally liable for $13,433,033.85 in damages plus $350,000 in punitive damages.

On March 10, 2023, Greenfield Assisted Living of Winchester filed a Chapter 7 bankruptcy petition in the Bankruptcy Court for the Eastern District of Virginia.  On June 27, 2023, the Chapter 7 trustee and Cork signed a settlement agreement.  The bankruptcy court approved the compromise with one exception: the court found that the other Greenfield parties were not in privity with Greenfield Assisted Living of Winchester, so the settlement agreement

- 11 -

"does not have any res judicata or collateral estoppel effect on the Greenfield [p]arties and therefore shall have no preclusive effect in the state court litigation between the Greenfield [p]arties and Cork." The parties then brought the settlement and approval order to the Winchester Circuit Court, which entered final judgment for Cork against Greenfield Assisted Living of Winchester for $11,376,289 and removed Greenfield Assisted Living of Winchester as a party to this suit.

The circuit court then held a bench trial for the claims against the remaining Greenfield entities and Peponis on January 8-10, 2024.

## VI. Trial

At trial, Nudo,[16] Talbert, Peponis, and Bryant testified, and Cork read into the record portions of transcripts from Scanlon's, Hallock's, Teague's, and Bolling's depositions.

Cork also presented evidence to support its veil piercing request. On Peponis's personal bank statement from February to March 2016, it showed that Greenfield Senior Living wired $1 million and $410,012 to Peponis. Peponis testified that he believed both were dividends from refinancing multiple Greenfield properties. He also admitted that he took random disbursements rather than yearly or quarterly. In September 2014, Peponis sent $200,000 to Greenfield Senior Living but never memorialized it or created associated corporate minutes. In July 2015, Greenfield Senior Living wired $100,000 to Peponis for a deposit on a deal in New Mexico; Peponis wired $50,000 of it to the bank for the deal. In November 2017, he transferred $500,000 to Greenfield Senior Living because it "just needed some money." Peponis admitted that money going back and forth while he owned Greenfield Senior Living was "[n]ot at all uncommon," but he never kept notes, corporate minutes, or any other documents memorializing the transactions.

---

[16] During Nudo's testimony, the trial court sustained Greenfield's relevance objection, barring Nudo from testifying about whether he would have expected Greenfield to tell Cork if something material happened to their company in 2015.

Finally, Cork showed that, in 2017, Greenfield Senior Living paid the mortgage on Peponis's home in Falls Church.

When Cork rested on the third day, Greenfield moved to strike all the claims. Greenfield argued that the lease is an unenforceable agreement to agree because there is neither a price agreement nor a formula or method to determine the price. Greenfield thus claimed that Cork's breach of contract claim must fail. Greenfield also contended that there was insufficient evidence of fraudulent inducement or fraud because (1) the 2014 audited financial statements were accurate, (2) Cork's assumption that the 2013 and 2014 financial trends would continue in 2015 did not equate to fraud from Greenfield, and (3) Cork accepted Greenfield's explanation and proceeded with the renovation after the unaudited 2015 financial information was mistakenly sent.

In response, Cork argued that the lease affords the necessary basic terms and how to amortize the base rent items. Additionally, although the agreement provided Greenfield flexibility in terms of design and therefore final costs, because Cork's obligation was fixed at $66.67 per square foot, it was an enforceable agreement. For fraud and fraudulent inducement, Cork claimed that Greenfield's failure to correct or clarify its financials when it knew that Cork was relying on them was a willful omission of a material fact. Purportedly, Cork argued, Greenfield knew about the major 2015 events that reduced its shareholder equity before the 2014 audited financial statements were completed and sent to Cork. But Greenfield revealed none of that to Cork until after the lease was signed. Similarly, although Greenfield knew the unaudited 2015 financials were wrong, it did nothing to correct the misrepresentation. Cork thus claimed there was ongoing fraud. And Cork argued that the estoppel certificate, paired with Peponis's assurances that he would sign a personal guaranty and cover the rent and construction costs if needed, showed the reasonableness of its reliance.

Finally, Cork argued that the court should pierce the corporate veil and assess the $11 million judgment from the bankruptcy settlement with Greenfield Assisted Living of Winchester against Peponis and the other Greenfield entities. It claimed that Greenfield ignored corporate formalities, that Peponis and Greenfield Senior Living were one-in-the-same and commingled funds, and that the Greenfield subsidiaries were undercapitalized from their creation.

The circuit court granted the motion to strike on all counts. It found that the lease was an unenforceable agreement to agree because there was no price agreement, price formula, or design agreement—the lease merely said "approximately [$87] per square foot" and mentioned that the parties would continue negotiating. For that reason, the breach of contract and fraudulent inducement claims failed. For fraud, the court found that there was no prima facie showing that there was an attempt to mislead in either of the financial statements Greenfield sent to Cork; there was no showing that any of the documents were false or that there were omissions. Lastly, the court declined to pierce Greenfield's corporate veil. In the court's view, "after making a finding that, there is no enforceable contract and that there is no showing of fraud, . . . it would be fundamentally unfair and not equitable to enforce a judgment agreed to by the bankruptcy trustee against other Greenfield parties and Mr. Peponis." The court entered a final order on January 29, 2024.

Cork appeals.

## STANDARD OF REVIEW

"A motion to strike should be granted if the evidence presented is insufficient as a matter of law to support the plaintiff's claim, and thus the case or individual issue should not be submitted to the factfinder." *Graydon Manor, LLC v. Bd. of Supervisors of Loudoun Cnty.*, 79 Va. App. 156, 166 (2023). Because it presents "an issue of law, we review de novo" the circuit court's decision to grant a motion to strike. *Collelo v. Geographic Servs.*, 283 Va. 56, 80 (2012)

(McClanahan, J., concurring in part and dissenting in part). In our review, "the non-moving party must be given the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom." *Bd. of Supervisors of Cnty. of Albemarle v. Route 29, LLC*, 301 Va. 134, 150 (2022) (quoting *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021)).

## ANALYSIS

On appeal, Cork argues that the circuit court erred by striking its breach of contract, fraud, and fraudulent inducement claims. We agree. Because the lease provides fixed design terms and reasonably certain price terms or methods to find the amounts payable, we find that it was an enforceable agreement. And, construing the evidence in the light most favorable to Cork, we find that Cork's evidence of fraud and fraudulent inducement was sufficient to withstand Greenfield's motion to strike.[17]

### I. Breach of Contract

Cork sued Greenfield for breaching the lease. But before there can be a breach, there must be a "legally enforceable obligation." *Young-Allen v. Bank of Am., N.A.*, 298 Va. 462, 469 (2020). Here, the circuit court granted Greenfield's motion to strike based solely on this threshold question, finding that the lease was an unenforceable agreement to agree.

"The interpretation of a contract is a question of law that this [C]ourt reviews de novo." *Bolton v. McKinney*, 299 Va. 550, 554 (2021). While we give deference to the circuit court's

---

[17] Cork also claims that the court erred by excluding Nudo's testimony as irrelevant, *see supra* note 16, and refusing to pierce Greenfield's corporate veil to hold Peponis and the other Greenfield entities jointly and severally liable. As in all of our cases, "[t]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Flowers v. Commonwealth*, 84 Va. App. 143, 162 n.6 (2025) (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017)). We therefore do not address whether the court improperly excluded Nudo's testimony. We also do not separately consider Cork's claim to pierce Greenfield's corporate veil because, given our ruling here, it must be properly evaluated on remand.

Greenfield also raises seven assignments of cross-error. Because Greenfield provides no principles of law or authorities beyond the standards of review to support its arguments, we find that they are waived under Rule 5A:21(e)(2).

factual findings underlying its interpretation of the contract, "we are not bound by [its] conclusions as to the construction of the disputed provisions." *Craig v. Craig*, 59 Va. App. 527, 537 (2012) (quoting *Bergman v. Bergman*, 25 Va. App. 204, 211 (1997)). "[R]ather, we have an equal opportunity to consider the words of the contract within the four corners of the instrument itself." *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 631 (2002). "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Bolton*, 299 Va. at 554 (quoting *Schuiling v. Harris*, 286 Va. 187, 192 (2013)).

For a contract to be enforceable, "[t]here must be mutual assent of the contracting parties to terms reasonably certain under the circumstances." *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 345 (2016) (quoting *Allen v. Aetna Cas. & Sur. Co.*, 222 Va. 361, 364 (1981)). This can include a sum specified in the agreement, or a method or formula to determine the amount payable. *Allen*, 222 Va. at 364; *Navar*, 291 Va. at 347. But "agreement[s] to agree in the future" are "'too vague and indefinite to be enforced.'" *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514, 519 (1997) (quoting *Allen*, 222 Va. at 364). It is thus "well settled under Virginia law that agreements to negotiate at some point in the future are unenforceable." *Navar*, 291 Va. at 346 (quoting *Beazer Homes Corp v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490 (E.D. Va. 2002)). Indeed, "an agreement to 'negotiate open issues in good faith' to reach a 'contractual objective within [an] agreed framework' will be construed as an agreement to agree rather than a valid contract." *Navar*, 291 Va. at 346-47 (alteration in original) (quoting *Va. Power Energy Mktg., Inc. v. EQT Energy, LLC*, 3:11CV630, 2012 U.S. Dist. LEXIS 98553, at *4 (E.D. Va. July 16, 2012)). In any event, "[c]ontracting parties are presumed to have intended

that which renders their agreement valid and capable of performance and not that which renders it void and impossible of execution." *Taylor v. Taylor*, 176 Va. 413, 425 (1940).

To Greenfield and the circuit court, the pertinent lease provisions merely create a broad framework for negotiation. Because Cork and Greenfield simply had to "engage in a cooperative effort" to prepare the design documents and final plans, meaning the actual renovation designs were left open to future negotiation, Greenfield claims this is no more than an agreement to agree. Greenfield focuses on the fact that the design documents were never finished nor attached to the lease. Greenfield also contends that the lease left the price open to future negotiation because the final costs "may be more or less than the target of $87 per square foot," and the circuit court agreed, finding that "there was no mechanism to achieve [a price]."

We disagree.

"The law does not favor declaring contracts void for indefiniteness and uncertainty, and leans against a construction which has that tendency." *Jimenez v. Corr*, 288 Va. 395, 415 (2014) (quoting *Reid v. Boyle*, 259 Va. 356, 367 (2000)). Consider *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338 (2016). There, the agreement provided that if the appellant was "awarded a prime contract then it would negotiate in good faith with [the appellees] and, 'upon arriving at prices, terms and conditions acceptable to the parties,' enter into subcontracts." *Id.* at 342. Our Supreme Court, finding that there was neither a sum, nor reasonably certain method for determining a sum, nor any requirement that the parties mutually agreed that the appellees would be the actual subcontractors hired by the appellant once the contract was awarded, held that it was merely an agreement to agree. *Id.* at 347. That is not the case here.

The non-binding letter of intent that Greenfield and Cork signed before they negotiated and signed the lease may be a prototypical agreement to agree. But, unlike *Navar*, Greenfield and Cork then reduced to writing a lease with reasonably certain terms evincing their mutual

intent to design a long-term facility for Greenfield and detailing each party's essential commitments. *See Dodge v. Trs. of Randolph-Macon Woman's College*, 276 Va. 1, 5-6 (2008) ("In order to be binding, an agreement must be definite and certain as to its terms and requirements; it must identify the subject matter and spell out the essential commitments and agreements[.]"). Indeed, while the parties in *Navar* described a contractual objective and negotiation for a future formal contract or subcontract to be drawn up, here, the parties (1) established reasonably certain price terms or methods to find the amounts payable, and (2) provided sufficiently definite requirements and the parties' essential commitments.

The circuit court found that "there was no mechanism [in the lease] to achieve [a price]." Not so. Read as a whole, as we must do, the lease provides reasonably certain methods or formulas to determine the amounts payable. *See Cappo Mgmt. v. V Britt*, 282 Va. 33, 37 (2011) ("[W]hen considering the meaning of any part of a contract, we will construe the contract as a whole." (quoting *Lansdowne Dev. Co. v. Xerox Realty Corp.*, 257 Va. 392, 401 (1999))); *see also Allen*, 222 Va. at 364; *Navar*, 291 Va. at 347. Though complex, and at times unartfully drafted, the lease sets forth fixed cost breakdowns and several workable formulas to calculate other costs.

To start, no one disputes that Cork must solely pay for all "material, labor, and equipment" to construct a new porte-cochere over the circular entry drive, a new ground floor entry lobby, a new loading dock receiving area with a freight elevator shaft, and an enclosure for the existing outdoor solarium. Cork must also, at its expense, ensure that all mechanical, electrical, and plumbing equipment for the building are adequately working, and replace all exterior windows if required by code or licensure. And Cork must remedy any unforeseen existing conditions, such as the asbestos remediation.

Calculating base rent is equally straightforward. To reiterate, the lease defines annual base rent as "the sum of: (a) $12.00 multiplied by the square footage of the Premises; and (b) seven percent (7%) of the product of: (i) $66.67; and (ii) the square footage of the Premises." It then increases by a cumulative 2% each year for 20 years. As a basic equation, annual base rent = (12 x 52,733) + [.07 x (66.67 x 52,733)], which can be solved using the basic order of operations in mathematics.[18]

Greenfield's main argument that the price term is uncertain surrounds the construction deposit and final budgeted costs. Recall that the construction deposit "shall equal the excess of: (i) the [f]inal [b]udgeted [c]ost (on a per square foot basis), over (ii) [$66.67] per square foot, multiplied by the final square footage of the Premises." And "[i]n no event will the [c]onstruction [d]eposit be less than [$1 million]." To Greenfield, "there is no way that anyone examining the [l]ease, . . . including the parties, the [c]ircuit [c]ourt[,] or this Court, can determine what the . . . price of the Tenant's Improvements . . . should have been," and, echoing the circuit court, "[n]or does the [l]ease supply a methodology or formula by which to determine [either]."

Greenfield is correct that we cannot place a final, round number on the final costs of the project. The final plans and costs rely on the design development documents, which rely on the space plan, which rely on competent collaboration between the interior designers and architects, and so on. But it would be implausible to hinge the enforceability of a build-to-suit agreement on the parties' ability to, at the beginning, set fixed numbers on each step of the process. Indeed,

---

[18] There is an overused adage used in courtrooms across the country: "I went to law school because I am bad at math." Although there is perhaps some truth found in this phrase, we are confident that this formula is not overly complex and can be solved using the basic order of operations.

for the reasons articulated below, that would be incompatible with the purpose of a such an arrangement.

That is why, as here, the law allows sophisticated parties to create reasonably certain *methods* to determine amounts payable and how those costs are distributed. And in doing so, it suppresses any suggestion that the ultimate agreement itself remained incomplete or negotiable. Here, Cork is responsible for $66.67 per square foot of the Premises, or around $3.5 million, and Greenfield pays any amount of the final cost above that amount on a per-square-foot basis. This is much like outlining each party's financial obligations through percentages—the final cost may be unknown, but the parties agreed to a mechanism for how they will bear that responsibility. In other words, Cork and Greenfield agreed to create a facility fulfilling Greenfield's wishes, thus supplying the build-to-suit flexibility, while creating a sensible cost-sharing relationship—a financial cap for Cork as the passive party and a financial floor for Greenfield as the party largely driving the design and, therefore, the costs.

This finds added support in the provision that the construction deposit can be no less than $1 million. Through this figure and the construction deposit formula, the parties contemplated a minimum final budgeted cost. In other words, Cork and Greenfield purportedly knew when contracting approximately what it would take to complete basic renovations on the Winchester building for the facility, but they chose to create mechanisms whereby Greenfield could exceed the target costs so long as it understood that it would increase its proportionate share of the final costs.

Additionally, contrary to Greenfield's belief, none of this is changed by the "target" of approximately $87 per square foot. Agreeing to target an approximate cost is not the equivalent of agreeing to negotiate the contract's subject matter and essential commitments, especially when, in the same breath, the parties memorialized workable and detailed cost-sharing formulas.

Again, contracts must be read as a whole, not as isolated fragments. *See First Am. Title Ins. Co. v. Seaboard Sav. & Loan Ass'n.*, 227 Va. 379, 384 (1984). They must also be read with an attempt to give reasonable meaning to each provision. This Court "will not treat any word or clause as meaningless if any reasonable interpretation consistent with the other portions of the contract can be ascribed to it." *First Am. Bank v. J.S.C. Concrete Constr., Inc.*, 259 Va. 60, 69 (2000) (quoting *Daugherty v. Diment*, 238 Va. 520, 525 (1989)).

As such, mentions of the approximate target of $87 per square foot are best read as Cork's and Greenfield's mutual intent to incentivize efficiency and cost-effectiveness throughout the renovations. It does not, as Greenfield suggests, reflect an understanding that the agreement itself remained negotiable. In other words, it is an agreement to encourage collaboration and financial risk-sharing so the ultimate product is mutually profitable. And we cannot forget that the target number, $87 per square foot, was the product of negotiation and assent. We turn now to Greenfield's argument that the actual renovation designs were left open to future negotiation.

To Greenfield, because Cork and Greenfield simply had to "engage in a cooperative effort" to prepare the design documents and final plans, and because none of the documents were finished, the lease is an unenforceable agreement to agree. In essence, Greenfield asks us to invalidate the basic structure of a build-to-suit or design-build contract. But a requirement that parties cooperate is not synonymous with a negotiable agreement in which the contract's subject matter and essential commitments remain open to discussion. Yes, the parties were to "engage in a cooperative effort" to prepare the design documents and, ultimately, the final plans and specifications.[19] But that is the point of a build-to-suit or design-build project. Such projects, as

---

[19] Greenfield also makes much ado about the lease requiring input from the general contractor. But this does not change the enforceability of the lease. Indeed, a construction project whereby a general contractor has no involvement in design and cost planning is nonsensical.

their names suggest, are meant to be fluid and to facilitate collaboration to ensure that the design meets the tenant's needs; their entire purpose is suitable customization. Indeed, agreeing with Greenfield would flip build-to-suit and design-build contracts on their head. No prudent company, investor, or contractor would ever undertake such a project if its counterpart may simply walk away unscathed under the guise that it was nothing but a negotiable goal within an agreed framework.

That is why the lease here limited Greenfield's right to approve or disapprove of the design by requiring that any approval or disapproval be *reasonable*—because the parties intended to create a facility that would meet Greenfield's needs for the next 20 years, while also protecting Cork from being strung along and delayed by superfluous demands.[20] Such a term would be unnecessary if the parties had not intended to enter into a long-term agreement. This is also why the lease supplies strict deadlines throughout the multi-step process. In other words, it invites the question that, if this was simply an agreement providing a framework to negotiate open issues, why would the parties go to such lengths to set agreed-upon, strict deadlines within 60 days of signing the lease or within 90 days of approving the design development documents? In the same way, including provisions that carry the project along regardless—such as considering the documents approved if Greenfield does not respond within five days—would be useless if it is just a broad framework for negotiation.

---

[20] The parties knew and understood the purpose of a build-to-suit contract when they designed the lease. As Teague testified, "[i]t was [Greenfield's] project to design to their parameters, provided reasonable approval by [Cork]," and Greenfield needed to dictate the design process to run its operation according to their business plans. Then, based on Greenfield's wishes, "[Cork] would . . . prepare the design development documents and the construction drawing." Talbert said the same when he testified that the largest contributing factor to a project budget is the project scope which is driven by the tenant's design. And as Bryant added, Greenfield drove certain aspects of the demolition, such as demolishing a working mechanical system, that Cork would not have otherwise done.

In short, we find that the design development and construction process provided by this lease is not a framework for future good-faith negotiations simply because it calls for collaboration. Rather, we find that the lease here sets forth sufficiently definite requirements and the parties' essential commitments thereto. *See Dodge*, 276 Va. at 5-6.

Finally, we cannot ignore that, five months after signing the lease, the parties signed an estoppel certificate reiterating that the lease remained in full force and effect, that neither party was in default, and that the lease was the complete agreement between the parties.

In all, Greenfield wants to enjoy the benefit of designing a facility with little regard for the associated costs while retaining the ability to walk away when its own proposals prove too costly. But "[w]e do not 'permit parties to be released from the obligations which they have assumed if this can be ascertained with reasonable certainty from language used, in light of all the surrounding circumstances.'" *Jimenez*, 288 Va. at 415 (quoting *Reid*, 259 Va. at 367). Because the lease provides reasonably certain price terms or methods to find the amounts payable and spells out both parties' essential commitments to the build-to-suit project, it was not an unenforceable agreement to agree.[21]

## II. Fraudulent Inducement and Fraud by Nondisclosure

Cork next assigns error to the circuit court striking its fraud claims. To the circuit court and Greenfield, Cork's evidence did not show that any of the financial documents were false or that there was deliberate nondisclosure designed to prevent Cork from learning the truth. Greenfield adds that, even if there were misrepresentations, Cork could not reasonably rely on

---

[21] Again, "judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Flowers*, 84 Va. App. at 162 n.6 (quoting *White*, 293 Va. at 419). The circuit court did not address the merits of Cork's breach of contract claim because it found that the agreement was unenforceable, and we decline to address the merits ourselves. Having found that the circuit court erred in its enforceability finding, Cork's breach of contract claim must be properly evaluated on remand.

the financial documents. We disagree. As we explain, Cork's evidence showed that Greenfield created a false impression of its financial standing both before the lease was signed and during the ongoing performance of the contract. As a result, there was prima facie evidence of a misrepresentation of a material fact needed to prove fraud or fraudulent inducement.[22]

Again, we review the circuit court's decision to strike Cork's claims in the light most favorable to Cork and give Cork the benefit of all substantial conflicts in the evidence and all fair inferences drawn therefrom. *Route 29*, 301 Va. at 150 (quoting *Dill*, 300 Va. at 109). To prevail on a fraud claim, "the plaintiff must prove a false representation, of a material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage." *Doe ex rel. Doe v. Baker*, 299 Va. 628, 655 (2021) (quoting *Yuzefovsky v. St. John's Wood Apartments*, 261 Va. 97, 111 (2001)). Fraudulent inducement similarly requires a false representation of a material fact that induces a party to contract on which they had a right to rely and results in damages. *Nestler v. Scarabelli*, 77 Va. App. 440, 463 (2023). The heart of Cork's fraud claims is whether Greenfield's purported concealment or nondisclosure amounted to a false representation of a material fact.

Concealment of a material fact may yield a claim for actual fraud. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999) (applying Virginia law).

---

[22] The circuit court struck Cork's fraudulent inducement claim in part because it found that the agreement was an unenforceable agreement to agree. On the merits of both fraud and fraudulent inducement, the court assessed only whether there was an intentional misrepresentation. Where a trial court made no ruling with respect to an issue, we will not address that issue on appeal. *See Duva v. Duva*, 55 Va. App. 286, 299 (2009) ("Because the record does not show that the trial court ruled on appellant's argument, there is no ruling of the trial court for this Court to review on appeal."); *Lostrangio v. Laingford*, 261 Va. 495, 497 n.2 (2001) ("The trial court made no ruling with respect to the Town's demurrer and, accordingly, we will not address that issue in this appeal."). *See also* Rule 5A:20(c); *Ceres Marine Terminals v. Armstrong*, 59 Va. App. 694, 698 n.1 (2012) ("Under our Rules, we only address arguments encompassed by an appellant's express 'assignment of error' in his brief."). Our focus accordingly lies solely on this ruling and not the remaining elements of each claim.

"Concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Allen Realty Corp. v. Holbert*, 227 Va. 441, 450 (1984). "[C]oncealment, whether accomplished by word or conduct, may be the equivalent of a false representation," *Lambert v. Downtown Garage, Inc.*, 262 Va. 707, 714 (2001) (quoting *Spence v. Griffin*, 236 Va. 21, 28 (1988)), because it "always involves deliberate nondisclosure designed to prevent another from learning the truth," *Van Deusen v. Snead*, 247 Va. 324, 328 (1994). Indeed, concealment of a material fact "knowing that the other party is acting on the assumption that no such fact exists, is as much fraud as if existence of the fact were expressly denied." *Metrocall of Delaware, Inc. v. Continental Cellular Corp.*, 246 Va. 365, 374 (1993); *see also* Restatement (Second) of Contracts § 160 (1981) ("Action intended or known to be likely to prevent another from learning a fact is equivalent to an assertion that the fact does not exist."), *quoted in Van Deusen*, 247 Va. at 328-29. Accordingly, "[s]uch affirmative action is always equivalent to a misrepresentation," *Van Deusen*, 247 Va. at 329, and "has any effect that a misrepresentation would have," Restatement (Second) of Contracts § 160 cmt. a; *see also* Model Jury Instrs.—Civ. No. 39.010 ("A misrepresentation is any words or conduct which produces a false or misleading impression of fact in the mind of another.").

The same can be said with nondisclosure of a material fact. In certain circumstances, "[a] person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist." Restatement (Second) of Contracts § 161; *see also Hitachi*, 166 F.3d at 629 ("[A] party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud." (quoting *Van Deusen*, 247 Va. at 328)). Two such situations include where the person "knows that disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material," or "knows that disclosure of the fact would correct a mistake of the other party as to a basic

- 25 -

assumption on which that party is making the contract." Restatement (Second) of Contracts § 161. Thus, "[l]ike concealment, non-disclosure of a fact may be equivalent to a misrepresentation." Restatement (Second) of Contracts § 161 cmt. a. But, in any event, silence alone is not enough "in the absence of a duty to disclose." *Doe*, 299 Va. at 655 (quoting *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999)).

A party making a contract is not "expected to tell all that [it] knows to the other party, even if [it] knows that the other party lacks knowledge on some aspects of the transaction." Restatement (Second) of Contracts § 161 cmt. a. "Before nondisclosure may constitute fraud . . . there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to [them]." *Doe*, 299 Va. at 656 (first alteration in original) (quoting *Jane Doe 43C v. Diocese of New Ulm*, 787 N.W.2d 680, 687 (Minn. Ct. App. 2010)). "A duty to disclose facts may exist under certain circumstances, such as when a confidential or fiduciary relationship exists between the parties or *when disclosure would be necessary to clarify information already disclosed*, which would otherwise be misleading." *Id.* (emphasis added) (quoting *Jane Doe 43C*, 787 N.W.2d at 687). For instance, even when an assertion is initially neither fraudulent nor a misrepresentation, a transacting party may come to know or learn information that bears significantly on their earlier assertion. Restatement (Second) of Contracts § 161 cmt. c. When the party learns that the earlier assertion is no longer true, that party is expected to "speak up" and correct the now misleading assertion. *Id.* Or, if the assertion "was a misrepresentation but was not material because [the party] had no reason to know of [its counterpart's] special characteristics that made reliance likely," the party must correct the initial assertion if it learns the special characteristics. *Id.* With these principles in mind, we turn to the merits of Cork's claims.

- 26 -

Viewing the evidence in the light most favorable to Cork, and granting it all reasonable inferences, we find that it presented prima facie evidence of concealment or nondisclosure of a material fact sufficient to survive a motion to strike.

Greenfield's financial health and stability were no doubt material to Cork's decision to enter into a joint, multi-million-dollar renovation project and long-term lease with Greenfield. In particular, Cork could recoup its renovation costs from Greenfield under the lease by collecting base rent, so it was critical for it to have assurances that Greenfield was financially stable. This was also a major financial investment for Greenfield because it was expected to cover a portion of the renovation costs. Further, Greenfield's financial status was important to Cork's lender, who purportedly relied on Cork's representations as to Greenfield's creditworthiness. So, as Bryant explained, Cork wanted "as much [financial information] as [it] could get" and "asked for everything [it] could get [its] hands on." This included "financial statements, profit and loss, [and] balance sheets." In response, Greenfield provided only the 2014 audited financial statements. These statements showed that Greenfield Senior Living's 2013 total stockholder equity was $11.9 million, and its 2014 total stockholder equity was $14.9 million. Greenfield argues that these statements were facially accurate, and that alone should end our inquiry. But this argument is superficial and ignores key material facts.

The 2014 audited report claimed to fairly present Greenfield's financial position, including subsequent company events through June 29, 2015. Likewise, when Greenfield sent only the 2014 audited financial statements in response to Cork's broad request for information, Greenfield effectively implied that these statements were complete representations of Greenfield's financial health—i.e., no other facts existed that would call into question these figures. But when the 2014 statements were shared with Cork in December 2015, and when the lease was signed in March 2016, this was not true. To be sure, company equities and markets

- 27 -

fluctuate year to year. Here, however, Cork's evidence, viewed in the light most favorable to Cork, showed that Greenfield knew that the 2014 financial statements did not fully reflect its financial status when the lease was negotiated and signed.

First, before the report was issued on June 29, 2015, Greenfield added six new, but un-stabilized, leased properties on March 31, 2015, thus increasing the 2015 year-over-year lease costs by $4.9 million. Second, Greenfield sold two of its properties for $9.9 million on June 17, 2015, and chose to distribute much of those proceeds to Peponis and McHarg, impacting the total equity by $4.4 million. Third, after the report was issued, McHarg, an 18% interest holder, left Greenfield on July 21, 2015, and Greenfield bought back $4.4 million of his shares. And, fourth, on February 5, 2016, Greenfield refinanced the mortgages on four of its properties for a $10.6 million cashout, but it distributed $2.6 million to shareholders and set aside the remaining $8 million in an investment account. Yet, despite knowing that these events would reshape Greenfield's equity, that the 2014 audited financials were no longer accurate representations of Greenfield's stockholder equity, and that Cork was relying on those 2014 financials for the deal, neither Scanlon nor anyone else from Greenfield told Cork.

Nudo testified that, after the 2014 audited statements were given to Cork, no one from Greenfield mentioned whether they were still accurate representations of the company. Indeed, Cork's evidence showed that it was acting under the assumption that Greenfield was financially stable and able to cover the annual rent, its portion of the renovation costs, and other expenditures. Additionally, Scanlon acknowledged that Cork wanted data for "visibility" on Greenfield's financial health and that he knew about the four events just described. But he did not share this information with Cork because he "didn't think it was material to the specific deal" and "didn't think it was really relevant."

This nondisclosure was compounded when Dill sent Cork the unaudited 2015 financial information. From these documents, Cork was led to continue believing that Greenfield was not only financially stable, but positively trending, which induced continued performance under the contract. As Bryant explained, there was concern over a $7 million distribution reflected in the documents, but Cork remained comfortable with Greenfield's finances because the statements showed an overall $25.9 million in owners' equity. Nudo echoed his sentiment, saying that the financials "appeared to show a good company who was doing even better from their financial condition in 2013 and 2014." He "was encouraged and felt comfortable, seeing that [Greenfield] had increased their net worth by, you know almost -- over $10 million, which is over 60 percent increase in net worth . . . . So [he] felt good about proceeding." Greenfield nevertheless claims that Cork unreasonably relied on this information.

To Greenfield, "no one outside of 'Management' could reasonably rely on the 2015 [unaudited financial statements]," because, in part, the statements had "red flags on their face." Greenfield, in hindsight, also repeatedly describes it as a "mistake" to share the 2015 unaudited financial information with Cork. Yet, although the official 2015 audited report may not have been available when Dill sent the unaudited documents, there was no evidence that anyone from Greenfield tried to correct or clarify any of the contents of the unaudited financials until much later. And Greenfield does not, nor can it, claim that it was unaware of the misrepresentation— Dill, Greenfield's director of finance, sent the email and copied Scanlon, the CFO. So, mistake or not, Cork's evidence prima facie showed that Greenfield knew that the information was a misleading assertion of its financial status, but it took no affirmative steps to correct the error.

In essence, an authorized representative of Greenfield presented to Cork that the $25.9 million shareholder equity was correct and that the company was positively trending. Yet Greenfield clarified this misrepresentation only after Cork questioned the drastically different

portrayal of Greenfield's financial status once the official 2015 audited report was shared. And, as Bryant explained, had Cork known that the information in the audit report was no longer correct, and had it learned about the significant decrease in owners' equity before March 2016, Cork would not have agreed to the lease. Put simply, when construing the evidence in the light most favorable to Cork, it is unpersuasive for Greenfield to claim that it was clearly a mistake to send the unaudited data and that Cork unreasonably relied on its contents, while it simultaneously never corrected that information.

For similar reasons, Greenfield cannot claim that it had no duty to disclose this information under these circumstances. As we have explained, Greenfield had a duty to correct or clarify otherwise misleading information it knew Cork was relying on, irrespective of its original veracity. Greenfield knew, or learned, information that reshaped the assertions it made when it shared the 2014 financial statements. It also knew that it misrepresented its financial status a second time—and exacerbated the initial misrepresentation—through the 2015 unaudited financials. Viewed in the light most favorable to it, Cork thus presented evidence that Greenfield was required to correct the errors or disclose new, clarifying information to prevent the previous assertions from becoming fraudulent misrepresentations, and it failed to do so.

In all, Cork's evidence supports a finding of nondisclosure or concealment of a material fact sufficient to survive a motion to strike. Construing the evidence in the light most favorable to Cork, Greenfield created a false impression of its financial viability through the 2014 audited financial statements and 2015 unaudited financial statements. Greenfield knew that its financial health was material to the deal and that Cork proceeded on the basic assumption that the shared documents fully depicted Greenfield's financial status and that Greenfield could financially support the renovations and long-term lease. It nonetheless did not tell Cork about known major events that reshaped the company's equity, nor did it correct or clarify the misleading financials,

as it was required to do, until after the parties signed the lease and lease amendment and after performance of the contract had begun. Such willful nondisclosure was enough to suggest an intent to practice actual fraud. In other words, it could be inferred that Greenfield's nondisclosures and failures to correct the misleading information were analogous to assertions that the otherwise correct facts did not exist. In turn, this nondisclosure was equivalent to a misrepresentation and has any effect that a misrepresentation would have.

As a result, we find that the evidence, viewed in the light most favorable to Cork at this stage in the underlying litigation, was sufficient for a prima facie showing of fraud or fraudulent inducement. The circuit court thus erred in striking Cork's fraud claims.[23]

CONCLUSION

For all these reasons, we reverse the circuit court's judgment and remand for proceedings consistent with this opinion.

*Reversed and remanded.*

---

[23] The circuit court did not address the merits of Cork's corporate veil piercing request because it found that, "after making a finding that, there is no enforceable contract and that there is no showing of fraud, . . . it would be fundamentally unfair and not equitable to enforce a judgment agreed to by the bankruptcy trustee against other Greenfield parties and Mr. Peponis." Once again deciding the case "'on the best and narrowest grounds available,'" *Flowers*, 84 Va. App. at 162 n.6 (quoting *White*, 293 Va. at 419), we too decline to address the merits of this claim on appeal. Nonetheless, having found that the circuit court erred in its enforceability finding and that Cork's evidence was sufficient for a prima facie showing of a misrepresentation of a material fact needed to prove fraud or fraudulent inducement, Cork's corporate veil piercing request must be properly evaluated on remand.